**M. Diane KOKEN, Insurance Commissioner, Commonwealth of Pennsylvania, Plaintiff**

v.

**LEGION INSURANCE COMPANY, Defendant.**

**Re: Application for Relief—GE Frankona Reinsurance Company, Ltd. and ERC Frankona Reinsurance (III), Ltd.**

Commonwealth Court of Pennsylvania.

Dec. 9, 2004.

Ordered Published Jan. 25, 2005.

Helen Mandel Braverman and Ryan J. Durkin, Philadelphia, for M. Diane Koken, Insurance Comm. of the Comm. of PA, in her official capacity as Statutory Liquidator for Legion Insurance Company (In Liquidation).

Steven E. Bizar and P. Kevin Brobson, Philadelphia, for intervenors, GE Frankona Reinsurance Co., Ltd., and ERC Frankona Reinsurance (III), Ltd.

OPINION and ORDER BY Judge LEAVITT.

Before this Court are applications for relief arising from a dispute between the Statutory Liquidator of Legion Insurance Company (In Liquidation) (Legion) and Intervenors GE Frankona Reinsurance Company, Ltd. and ERC Frankona Reinsurance III, Ltd. f/k/a Eagle Star Reinsurance Company, Ltd. (collectively Eagle Star).[1] The dispute concerns Legion's payment obligation to Eagle Star under an international property insurance program that operated from January 1, 1998, to late October 1999. This program, the "Commercial Property and Technical Risk Property Program—Inclusive of Machinery Breakdown," was known as the "GMI Program" because it was managed by Global Managers, Inc. (GMI) on behalf of Legion and its affiliate, Legion Indemnity Insurance Company (In Liquidation) (Legion Indemnity). Eagle Star was the lead underwriter[2] for the reinsurers participating in the GMI Program, and it also acted as the fronting company for certain international risks[3] covered under the GMI Program.

On March 19, 2002, prior to being placed into receivership, Legion sent a cession statement to Eagle Star showing that Legion owed Eagle Star $2,227,661 as of March 18, 2002, for obligations arising from the GMI Program. On August 16, 2002, after it was placed into receivership, Legion sent Eagle Star a new cession statement stating that as of March 18, 2002, Legion owed Eagle Star $14.5 million and that Eagle Star owed Legion Indemnity $12.2. Eagle Star's objection to the August 16, 2002, statement led to litigation in several jurisdictions and, specifically, to the outstanding matters before the Court.

### Procedural Background

On October 4, 2002, Eagle Star filed a declaratory judgment action against Legion and Legion Indemnity[4] in the United

---

1. Each Eagle Star company is a foreign insurer domiciled and licensed in the United Kingdom.

2. CNA was another lead underwriter on the GMI Program.

3. Neither Legion nor Legion Indemnity was licensed to write insurance on a direct basis outside the United States. Eagle Star and CNA also fronted for large domestic risks that exceeded Legion's financial capacity. Transcript of Hearing, 6/29/04, at 17–18 (Tr. ———).

4. Legion is a Pennsylvania domiciled insurance company and is now in liquidation. Legion Indemnity is an Illinois domiciled insurance company and is also now in liquidation.

States District Court for the Eastern District of Pennsylvania (Federal litigation). *GE Frankona Reinsurance Company, Ltd., et al. v. Legion Insurance Company, et al.,* No. 02–7713 (E.D.Pa). Eagle Star initiated this action to determine the validity of contractual setoff rights it claimed. Eagle Star asserted that the payments due to or from Legion and Legion Indemnity had to be netted before either company could demand a payment from Eagle Star. Eagle Star maintained that, for all intents and purposes of the GMI Program, Legion and Legion Indemnity were one and the same. This understanding of the contractual arrangement was, according to Eagle Star, expressed in every writing relating to the GMI Program.

Legion and Legion Indemnity filed separate motions asking the District Court to dismiss or stay the Federal litigation because of the Legion receivership proceeding in this Court (the Rehabilitation) and a conservation proceeding initiated against Legion Indemnity in Illinois (the Conservation). *In the Matter of the Liquidation of Legion Indemnity Company,* No. 02 CH 6695, Circuit Court of Cook County, Illinois County Department, Chancery Division. Legion Indemnity asserted that Eagle Star's claim should be resolved by the Illinois Court handling the Conservation, and Legion asserted that this Court should adjudicate Eagle Star's claim as to it. In response, Eagle Star argued that the inability of Legion and Legion Indemnity to agree upon a single state court to resolve the limited question presented by Eagle Star indicated that the District Court was the proper forum, under principles of diversity jurisdiction, for deciding the matter.

On March 18, 2003, the District Court ordered a stay of the Federal litigation. The District Court suggested that Eagle Star request this Court for relief from the stay against litigation ordered by this Court in the Legion Rehabilitation. Eagle Star then filed a Combined Petition to Intervene and Application for Relief from Stay with this Court, seeking permission to proceed with the Federal litigation. On July 25, 2003, after hearing argument and considering the positions of the Liquidator and Eagle Star, this Court granted Eagle Star relief from the stay of litigation against Legion.

Eagle Star then sought similar relief from the Circuit Court of Cook County, Illinois Chancery Division (Illinois Court), which was overseeing the Legion Indemnity Conservation. In response to Eagle Star's filing, the Liquidator filed a Notice of Consent with the Illinois Court, by which it consented to have the Illinois Court, not the District Court, decide Eagle Star's declaratory judgment action.

Eagle Star then filed with this Court an Application to Declare Consent of Liquidator Invalid. It complained that Legion's action was not authorized by this Court's July 25, 2003, order, which granted relief to allow the Federal litigation to proceed and made no mention of the Illinois Conservation proceeding.

On January 22, 2004, this Court directed the Liquidator to file a report pursuant to Section 508 of Article V of The Insurance Department Act of 1921, Act of May 17, 1921, P.L. 789, *as amended,* 40 P.S. § 221.8 (Article V). The Liquidator was directed to provide the accounting basis

Both are subsidiaries of Mutual Risk Management, Ltd. (MRM). Both insurers were managed and operated by Legion Management Company (Legion Management), another MRM subsidiary; in effect, Legion Management provided the employees to both insurers. Under a pooling agreement, expenses for the administration of each insurer's business for any given year, based upon a formula, were allocated. Tr. 36–38.

and the legal authority for the revised cession statement.[5] On February 23, 2004, the Liquidator filed this report.

The Liquidator's Report raised the question that the Liquidator may have made a payment on a Legion debt to Legion Indemnity in preference to other creditors and, at the same time, may have reduced Legion's cash flow that would otherwise be expected from Eagle Star under the GMI Program.[6] On March 31, 2003, this Court ordered the Liquidator to show why this Court should not order the Liquidator (1) to reverse the August 16, 2002, cession statement presented to Eagle Star and (2) to withdraw the consent filed with

the Illinois Court. After several continuances, the hearing was held on June 29, 2004, which was followed by the filing of post-hearing memoranda of law.

## Factual History

At the hearing on June 29, 2004, Gregg C. Frederick, Senior Vice–President for Reinsurance at Legion, before and after its receivership, testified. Mr. Frederick explained the history of the GMI program. GMI was responsible for the day-to-day operations of the GMI Program and its overall management. Maxson & Young, a third-party claim claims company, adjusted claims and prepared loss reports. To han-

---

5. This Court's order of January 22, 2004, provided:

> This report shall address the following items: the Legion accounting for the GMI program from inception to the present; how this accounting for the GMI program changed as a result of this Court's Rehabilitation Order of March 28, 2002; how this afore-referenced accounting change, if any, benefits Legion, its creditors and policyholders; the reasons for the revisions to Legion's March 19, 2002 cession statement as reflected In Legion's August 12, 2002 cession statement; *how the revisions made by the Insurance Commissioner to the afore-referenced cession statement benefit Legion*, its policyholders and creditors; the actuarial projections for future GMI program claims to be submitted by Legion and Legion Indemnity Company to Eagle Star; *what offset provisions are contained in the applicable reinsurance agreements;* whether the insolvency of either Legion or Legion Indemnity Company is addressed in any applicable offset provisions; *how the intercompany receivables between Legion and its affiliates were affected by this* Court's Rehabilitation Order of March 28, 2002; the intercompany receivables as of March 1, 2002 and January 1, 2004; and any other factual matters relevant and material to these above-listed items.
>
> (emphasis added).

6. Specifically, had Legion's claims under the quota share reinsurance developed significantly, Eagle Star would have been obligated

to Legion. Under the March 19, 2002, cession statement, Legion claims would have to exceed $2.3 million before Eagle Star could be called upon for a payment under the reinsurance treaty; under the August 16, 2002, cession statement Legion claims would have to exceed $14.5 million. A reduction in cash to the Legion estate would have allowed one creditor, *i.e.*, Legion Indemnity, to obtain a payment on its debt at a greater percentage than another creditor of the same class would receive. Section 530 of Article V states:

> A preference is a transfer of any of the property of an insurer to or for the benefit of a creditor, for or on account of an antecedent debt, made or suffered by the insurer within one year before the filing of a successful petition for liquidation under this article the effect of which transfer may be to enable the creditor to obtain a greater percentage of this debt than another creditor of the same class would receive.

40 P.S. § 221.30(a). This provision applies with equal force to transfers made after the filing of a successful petition for liquidation. The Liquidator may not make a payment on an antecedent debt that would allow one creditor a greater percentage payment on its debt than another creditor in the same class; it would violate the order of distribution established in Section 544 of Article V, 40 P.S. § 221.44. *See also In re Liquidation of Midland Insurance Co.*, 269 A.D.2d 50, 709 N.Y.S.2d 24, 33 (2000) (holding that "public policy dictates that in a liquidation proceeding all creditors are to be treated equally.").

dle the reinsurance, Legion and Legion Indemnity (collectively "Legion")[7] appointed Smythe, Sanford and Gerard, Inc. (SS & G) reinsurance broker and intermediary for the GMI program.[8]

Effective January 1, 1998, and January 1, 1999, Eagle Star entered into a quota share reinsurance agreement with Legion, pursuant to which Legion agreed to cede, and Eagle Star agreed to accept, a 40% (in 1998) and a 53.5% (in 1999) quota share of the claims from the GMI Program.[9] In the name of, and on behalf of Eagle Star, GMI issued insurance policies and certificates that were facultatively reinsured by Legion on a 90% quota share basis.[10] In this respect, Eagle Star acted as the fronting company for certain large or international property risks covered by the GMI Program. Legion retroceded the business assumed from Eagle Star to the quota share reinsurers, which included Eagle Star as lead underwriter. SS & G, the intermediary for the quota share agreement, was responsible for producing and transmitting all cession statements to Eagle Star and the other reinsurers in the program. All premium and loss payments were transmitted between the quota share reinsurers, on the one hand, and Legion, on the other hand, through SS & G.

The GMI Program grew rapidly, and this growth strained the systems. The quality of GMI's reporting on premiums, claims and expenses deteriorated. In October of 1999, Legion decided to terminate the GMI Program and so notified the reinsurers, including Eagle Star. Sometime thereafter, Legion terminated its relationship with SS & G and assumed direct responsibility for billing the quota share reinsurers. Thereafter, Legion and Eagle Star together agreed to hire Chiltington International, Inc. (Chiltington) to reconstruct the GMI Program's accounts from beginning to end. Chiltington did not generate a formal report, but it did offer its observation that substantial funds were missing. Chiltington could not reconcile all premium and loss payments channeled through SS & G for the duration of the GMI Program. It could not identify whether the problem existed at GMI, SS & G or at Legion. Accordingly, Legion then retained the services of Smart & Associates, LLP to retrace all activity relating to the GMI Program.

On February 21, 2002, Eagle Star and Legion and Legion Indemnity entered into an "Agreement." Mr. Frederick executed the document on behalf of Legion and Legion Indemnity, and at the hearing he acknowledged that the Agreement correctly recited the understanding of the parties. The Agreement provided, in relevant part, as follows:

> This Agreement is entered into on this 21[st] day of February, 2002 by and

---

7. In the operative contracts, the quota share agreement and Agreement of February 21, 2002, discussed more fully *infra*, Legion and Legion Indemnity were referred to as "Company" or "collectively 'Legion.' "

8. SS & G, as intermediary, handled Legion's billing to the quota share reinsurers. Tr. 21, 25. Prior to receivership, Legion terminated their relationship with SS & G and began to bill the quota share reinsurers directly. Tr. 68. Legion continued to report account balances on cession statements on a consolidated, or net, basis. Tr. 72. These billing func-

tions were handled by Legion Management Company out of its Milwaukee, Wisconsin office. Tr. 35–38.

9. CNA took 20% of the Legion assumed business in the first year. As in all Legion programs, it retained little underwriting risk. Tr. 16.

10. Mr. Frederick testified at the hearing that only Legion, and not Legion Indemnity, assumed the business ceded by Eagle Star under the GMI Program. Tr. 16, 51, 97.

between *Legion Insurance Company and Legion Indemnity Company (collectively "Legion")* on the one hand, and Eagle Star Reinsurance Company Limited and G.E. Frankona Reinsurance Company Limited jointly (collectively "Eagle Star") on the other.

\* \* \*

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth herein, the sufficiency of which is hereby acknowledged, *Legion and Eagle Star agree as follows:*

1. As soon as possible after executing this Agreement, Legion and Eagle Star agree to mutually cooperate and use their best efforts to complete and reconcile *the amounts that are owed to and from each other* with respect to the Quota Share and the Eagle Star Business from the inception of the Program through September 30, 2001.

Hearing Exhibit ES–5 (emphasis added). The Agreement, a single contract, consistently referred to Legion and Legion Indemnity as a single entity, *i.e.*, "Legion," as did the quota share agreements. Application to Declare Consent of Liquidator Invalid, Exhibits D, E.[11] The Agreement superseded all prior contracts to the extent they were inconsistent. Also on February 21, 2002, the parties, *i.e.*, "Legion" on the one hand and "Eagle Star" on the other, entered into a Joint Cooperation and Confidentiality Agreement to work together to "resolve the amounts owing between them." Appendix of Exhibits in Support of Combined Petition to Intervene and Application for Relief from Stay, Exhibit E at 2.

On March 19, 2002, in accordance with the two agreements of February 21, 2002, Legion issued its cession statement, which constituted its invoice to the reinsurers. The March 2002 statement combined the premium and claim obligations for Legion and Legion Indemnity for the years 1998 and 1999,[12] using the net balance accounting that had been the practice from the inception of the GMI Program. Tr. 29. The March 19, 2002, cession statement provided that as a result of the intercompany settling in relation to funds paid and remitted by the parties from the inception of the GMI Program until March 18, 2002, Eagle Star owed Legion - $2,277,661.[13] Tr. 30–31. Stated otherwise, Legion owed Eagle Star $2,277,661.

11. In each quota share agreement Legion and Legion Indemnity are identified as the "Company," for settlement or payment. The "Reinsurer" signifies "Certain Insurance and Reinsurance Companies, one of whom is named on the Attached Interests and Liabilities Agreement." Payments were to be transmitted "to the Company or the Reinsurer through SS & G." Application to Declare Consent of Liquidator Invalid, Exhibit D at 12 (Article 30–Intermediary) and Exhibit E at 12 (Article 31–Intermediary).

12. Both cession statements indicate in the title that the data reflected is "ITD to date." ITD stands for "inception to date." Tr. 35. The date, therefore, included all activity on the program from its inception to termination, and all loss data available to March 18, 2002.

13. Mr. Frederick reviewed the March 19, 2002, cession statement, marked for the record as Liquidator's Hearing Exhibit 508H2, and the master spreadsheet that "identified all the reinsurers … [and] what they were owed by whom," marked for the record as Liquidator's Hearing Exhibit 508H3 and Hearing Exhibit ES–1. Tr. 34. He testified that as of March 18, 2002, the cash expectation of the Legion Companies from Eagle Star was a negative amount. Legion owed Eagle Star $14,513,429; Eagle Star owed Legion Indemnity $12,235,767. Tr. 32–33. The March 19, 2002, cession statement shows numbers that differ slightly from those provided in Mr. Frederick's testimony. The e-mail letter from Legion personnel (Hearing Exhibit ES–1) and the testimony of Mr. Frederick indicates that the discrepancy in the numbers resulted from continued updating from loss-runs.

As of March 18, 2002, the participants in the GMI Program "were agreeing to net everything."[14] Tr. 79.[15] Eagle Star's claim payments under its fronted policies exceeded the amount that Legion was owed under the quota share contracts for claims and program expenses. Mr. Frederick explained at the hearing that as of March 18, 2002, neither Legion nor Legion Indemnity had any expectation of cash payments from Eagle Star. He stated that "Legion Indemnity would have expected to get paid by net settlements with Legion [Insurance] at that date." Tr. 82.

Mr. Frederick further explained, on cross-examination, the process by which the netting was done on the side of the Legion companies to calculate the $2,277,661 Legion owed to Eagle Star and the $12.2 million Legion owed to Legion Indemnity.

Q. And when you provided those netted statements you took the $12 million that was allegedly owing to Legion Indemnity and you reduced the 14 million plus by the 12 million to get to the netted amount of 2.2 million; correct?

A. Again, we did do that for administrative ease and then we were going to settle between the two companies, that's correct.

Q. Settle between Legion Indemnity and Legion Insurance; right?

A. That's correct. We do that quite frequently in our treaties as well where there are multiple companies involved.

. . .

Q. Mr. Frederick, prior to the receivership, who would have remitted the $2.2 million check to Eagle Star?

A. Because we're doing it on a combined basis and since Legion Insurance was the one that had the overall payable, I would imagine Legion would have—Legion Insurance Company would have or Legion PA would have issued it.

Q. And what would have happened to the $12 million receivable that you say is on the Legion Indemnity books for that amount that Legion Indemnity expected to receive from Eagle Star?

A. Legion Insurance Company would have had to pay that to Legion Indemnity.

Q. In cash?

A. Would have or it would have generated an intercompany when the intercompanies were settled that would have paid the cash.

Q. So pre-receivership, even though Legion Insurance and Legion Indemnity billed on a net basis, they were each paid according to what they were due; correct?

A. They would have been, assuming we had the cash flow.

Tr. 90, 105.

After Legion was placed into rehabilitation and Legion Indemnity was placed into conservation, Mr. Frederick revised the March 19, 2002, cession statement to "split the statements and send separate bills-or

14. Hearing Exhibit ES–15 refers to an agreement in an e-mail correspondence from Sharon Abel, an employee of Legion Management, to Mr. Frederick, dated March 21, 2002: "This is the same cession statement Julie sent on March 19th and I did agree we would not dispute that we owe at a minimum this amount [$2,277,661]. Under the terms of our agreement we are to settle up on March 29th, 2002. Sharon."

15. This means that premiums owed were netted against loss claims on each side: "Legion" on one side, and "Eagle Star" on the other.

in this case, cession statements, some of them were not actually bills." Tr. 43. Mr. Frederick believed that this was necessary once Legion and Legion Indemnity were placed under separate supervisions; he believed that the "administrative ease approach of just sending out combined statements" was no longer permitted. *Id.* The revised cession statement issued by Legion on August 16, 2002, restated the obligations of the participants in the GMI Program existing as of March 18, 2002. Hearing Exhibit ES-3. No amounts were reflected in the August 16, 2002, cession statement that had not been reflected in the March 19, 2002, cession statement. The March statement presented the accounts by *program year,* and the August statement presented the same accounts by *company and program year.* Thus, the new presentation showed that, as of March 18, 2002, Eagle Star owed Legion Indemnity approximately $12.2 million, and Legion owed Eagle Star approximately $14.5 million. This was the first time in the history of the GMI Program that a cession statement separated Legion and Legion Indemnity accounts *as to* Eagle Star.[16]

### Analysis

The Liquidator contends that the receiverships [17] of Legion and Legion Indemnity compelled the March 19, 2002, cession statement to be recast on August 16, 2002. The Liquidator notes that the Legion estate is subject to the terms of Article V, 40

P.S. §§ 221.1–221.63, and that the Legion Indemnity estate is subject to Act V, Article XIII of the Illinois Insurance Code, 215 Ill. Comp. Stat. 5/187–221 (2004). The Liquidator further notes that neither the Pennsylvania Liquidator nor the Illinois Liquidator has the authority to act for the other in any respect.[18] These observations are unassailable, but they do not pertain to the dispositive question, which is whether Legion's receivership required a recasting of its debts and credits, whatever they were, under the GMI Program.

Net balance accounting is widely used to reconcile premiums and losses between parties to insurance and reinsurance arrangements. As has been explained,

> [i]t provides rapid resolution of balances, reduces paperwork and avoids both unnecessary liquidation of assets, and unnecessary cash flow among the various parties. As a result, setoff is an integral part of the routine accounting practices which form the basis for insurance company financial reporting and analysis.
>
> ... While other industries rely upon secured transactions to protect against nonperformance by a party, this technique is not well suited to insurance and reinsurance transactions, where creditor and debtor often change roles and balances vary almost daily.

William J. Branum, *Setoffs, Recoupments, and Voidable Preferences—In the Insol-*

---

**16.** The cession statement did not, however, separate the accounts on the Eagle Star side of the program, *i.e.,* between GE Frankona Reinsurance Company, Ltd. and ERC Frankona Reinsurance (III), Ltd.

**17.** Mr. Frederick testified that, after the separate receiverships were filed, the companies continued to make inter-company accounting entries as between Legion and Legion Indemnity with respect to the GMI Program as information developed. It is acknowledged by the parties that the numbers set forth in

the two cession statements and used by the parties in the record are not the actual or correct numbers. No agreement has yet been reached on the correct numbers involved.

**18.** Thus, she explains that "following the respective receiverships, the affiliation of Legion PA and Legion IL for convenience's sake had to end, and the receivers were required to pursue the independent debits and obligations of their own insolvent insurers." Liquidator's Reply Brief at 6.

*vency Process, in* AMERICAN BAR ASSOCIA-
TION, LAW AND PRACTICE OF INSURANCE COM-
PANY INSOLVENCY REVISITED 907, 933 (F.L.
Semaya ed., 1989) (hereinafter Insurance
Company Insolvency Revisited). "Net bal-
ance accounting" is also known as "set-
off." [19] The practice has "practical and
economic benefits, reducing paperwork,
simplifying dispute resolution, and provid-
ing security for performance." Paul E.
Dassenko, *Obligations and Duties of the
Liquidator to Reinsurers—A Liquidator's
Perspective, in* INSURANCE COMPANY INSOL-
VENCY REVISITED 661, 663 (footnote omit-
ted).[20] At the June 29, 2004, hearing, Mr.
Frederick's testimony verified the use of
and need for net balance accounting in
reinsurance. The question is under what
circumstances it will govern post-receiver-
ship account reconciliations.

■ Branum explains that for setoff to
operate, there must be mutuality of debts
and credits. There are two factors that
govern a finding of mutuality: capacity
and time.

■ Mutuality in capacity requires that
debts exist between the same persons or
entities,[21] although the debts may arise
from multiple contracts. Branum explains
mutuality in reinsurance as follows:

> In a reinsurance context, if reinsurer A
> has several reinsurance contracts with

ceding company B, the outstanding bal-
ances on each contract may be setoff
against each other Generally, setoff is
appropriate even if the multiple con-
tracts between A and B provide for the
companies to act as both reinsurers and
cedants of each other under the separate
contracts.

Branum, *supra,* at 912–913. Normally,
mutuality in capacity does not exist among
affiliate insurers, unless the affiliates oper-
ate as a single entity. Branum notes that

> [m]utuality in capacity, however, may
> exist when affiliates have ceded business
> under a single contract to the insolvent
> reinsurer, and either through course of
> dealing or in the reinsurance agreement,
> the ceding insurers are treated as a
> single entity. Similarly, if multiple affil-
> iates or non affiliated insurers have
> formed a pool to act as a single entity,
> and premiums and losses have been ag-
> gregated through a course of dealing,
> mutuality of capacity may be found to
> exist. In both cases the parties have
> treated the group affiliates or pool as a
> single entity and *that relationship
> should continue to be recognized after
> insolvency.*

*Id.* at 913 n. 17 (emphasis added).

Here, multiple contracts established the
GMI Program, which operated for almost

---

**19.** Section 532 of Article V allows the setoff of
mutual debts and credits; it states:
> (a) Mutual debts or mutual credits between
> the insurer and another person in connec-
> tion with any action or proceeding under
> this article shall be setoff and the balance
> only shall be allowed or paid, except as
> provided in subsection (b).

40 P.S. § 221.32. This provision is patterned
after the federal Bankruptcy Act of 1898, 11
U.S.C. § 108, repealed and reenacted as 11
U.S.C. § 553. *See Prudential Reinsurance
Company v. Superior Court,* 3 Cal.4th 1118, 14
Cal.Rptr.2d 749, 842 P.2d 48 (1992). Section
532 of Article V is identical to Section 1031 of
the California insurer insolvency statute, Cal.
Ins.Code § 1031 (2004).

**20.** Dassenko argues, as does the Liquidator
here, that a reinsurer should not be allowed
to set off reinsurance proceeds owed to insol-
vent insurer A against a debt owed by insurer
A's affiliate, insurer B. At the time Dassenko
wrote this article, the California Supreme
Court had not issued its decision in *Pruden-
tial, supra,* setting forth the circumstances
where inter-affiliate setoff is appropriate and
where it is not.

**21.** Setoff can occur only between persons of
equal capacity. If one holds assets in trust,
those funds are not subject to setoff. *Downey
v. Humphreys,* 102 Cal.App.2d 323, 227 P.2d
484, 490 (1951).

two years, as a unitary insurance program. "Legion" and "Eagle Star" each played the role of direct writer, ceding company, assuming company and retrocessionaire. In their entire course of dealing, Legion and Legion Indemnity functioned not as separate companies but as a single entity.[22] As late as May 15, 2002, this single entity status can be seen in an e-mail by a Legion employee to Mr. Frederick:

> The Global Managers' quota share treaties and the Agreements with Eagle Star Re and Continental Casualty Company were written with Legion Insurance Comapany [sic] and Legion Indemnity Company *combined. We have never reconciled or separated the balances among the Legion Companies. We suspect more Legion Insurance Company funds have been used to settle Legion Indemnity claims than Indemnity funds used to settle Insurance claims.*
>
> *... No attempt has been made to quantify the balances due between the two Legion companies.*

Hearing Exhibit ES–12 (emphasis added). *See also* Tr. at 64–65. Under the Branum

test, mutuality in capacity exists because the affiliates, Legion and Legion Indemnity, acted as a single entity, as did GE Frankona and ERC Frankona.

■ Mutuality in time provides that preliquidation obligations can be set off against other preliquidation obligations; post-liquidation obligations may not be set off against preliquidation obligations. As Branum explains,

> [w]ithout this mutuality of time requirement, a person who owed money to the insolvent [insurer] before the insolvency could purchase claims against the estate thereafter at a reduced rate and use those claims as setoff against the more expensive preliquidation claim.

Branum, *supra*, at 914 (footnote omitted).

■ Here, the mutuality in time requirement is satisfied because all the obligations at issue between Legion and Eagle Star are pre-liquidation. In *O'Connor v. Insurance Company of North America*, 622 F.Supp. 611 (N.D.Ill.1985), the U.S. District Court considered, *inter alia*, the question of what constitutes a preliquidation debt.[23] It held that even though an

---

22. Settlement between participating companies was the standard way of conducting the GMI Program business. Eagle Star never received a bill from Legion Indemnity because when the GMI Program terminated, Legion was a "live company" that was "settling that [debt] within the companies." Tr. 81. The amount due and owing to Eagle Star by Legion was explained by Mr. Frederick:

> [W]e were in a net position for the two companies that we owed Eagle Star that money, and it's predominantly because they were paying claims on their own paper and that we owed them under that contract ... particularly Legion Insurance.... They [Eagle Star] paid their obligations under their fronted policies, which exceeded the amount that Legion was owed to be reimbursed under the quota share contracts.... [C]ontractually Legion Insurance owed Eagle Star for those fronted losses and net-

gle Star for those fronted losses and net-

Legion Indemnity and Legion Insurance was owed additional amounts and the net position of those overall amounts was that Eagle Star was owed money.
Tr. 80–81.

23. As here, the court considered the Illinois insolvency statute, which is based upon one of the model liquidation statutes adopted by the National Association of Insurance Commissioners (NAIC). This is also the case with the Pennsylvania insolvency statute set forth in Article V. The *O'Connor* court noted that the Illinois statute, also based upon the NAIC Model Act, was modeled on the federal Bankruptcy Act of 1898, *as amended,* and not the later Bankruptcy Code. This makes the 14th edition (1978) of *Collier On Bankruptcy*, not the more recent 15th edition, the relevant treatise. *See O'Connor*, 622 F.Supp. at 616 (citing 4 *Collier On Bankruptcy* (14th ed. 1978)). As noted, this setoff provision has its

obligation under a reinsurance agreement was not due to be paid as of the date of liquidation, it was fixed prior to the liquidation. Thus, it was a preliquidation debt. That is the situation here. Because the GMI Program had terminated several years before Legion's receivership, the obligations of the parties to the GMI Program were fixed prior to Legion's receivership. Legion's obligations under the GMI Program are preliquidation obligations even though the final accounting had not been completed when it was placed into receivership.

On March 19, 2002, using net balance accounting, Legion calculated its debt to Eagle Star at, approximately, $2.3 million and its debt to Legion Indemnity at $12.2 million.[24] By recasting this debt, Legion excused Legion Indemnity from filing a proof of claim against the estate in the amount of $12.2 million, substantially improving Legion Indemnity's position. A receivable from a solvent entity, Eagle Star, replaced a receivable from the insolvent Legion estate.[25] At the same time, Eagle Star had its claim against Legion increased from $2.3 million to $14.5 million.

The Liquidator argues that Eagle Star's obligations can be traced to separate contractual obligations and, thus, they must be separated.[26] This is not relevant to a setoff of mutual debts and credits, which always involves multiple contracts. Branum, *supra*, at 912 ("Setoff by definition involves multiple contracts.") (footnote omitted).

Mr. Frederick testified that it was mere "convenience" that led to the net balance accounting to be used throughout the GMI Program. It was unmistakenly more efficient to calculate the amounts due and owing on a net basis, instead of having a series of checks sent across the Atlantic from Legion to GE Frankona and from ERC Frankona to Legion Indemnity, or vice versa. However, this convenience was imbedded in the contractual relationship between Legion and Eagle Star. The Agreement of February 21, 2002, the placement slips and all other writings affirm that the obligations between "Legion," on one hand, and "Eagle Star," on the other, would be netted. "Legion" is identified as a single party, the "Company," in the quota share agreements.

---

origins in the federal Bankruptcy Act of 1898, 11 U.S.C. § 108, repealed and reenacted as 11 U.S.C. § 553. *See Prudential*, 842 P.2d at 50.

24. The parties entered a stipulation on the record at the hearing to the effect that the parties agree that it is not known how many more claims will be paid under this program by Eagle Star or by CNA on their direct paper. It also is not known how many more claims will be paid by Legion Indemnity through the guaranty funds on Legion Indemnity paper, but it is unlikely that, on a net basis, Eagle Star will ever owe the estate of Legion any funds. Tr. 117.

25. The reinsurance contracts, as opposed to the placement slips, have only recently been uncovered. Interestingly, they require that all contract disputes be resolved in accor-

dance with Pennsylvania law. The Liquidator rejoins that the reinsurance contracts have been superseded by the Agreement of February 21, 2002, which does not specify the jurisdiction for a contract dispute. Somewhat inconsistently, however, the Liquidator argues that the netting procedures set forth in the Agreement do not have primacy. Rather, the underlying contracts, that have been superseded, must be used to determine the respective debts and obligations of Eagle Star, Legion and Legion Indemnity.

26. Stated otherwise, the GMI Program risks received a policy from a discrete company, not the collective "Eagle Star" or the collective "Legion companies." However, the contractual performance obligation, as to an insured, reinsured or retrocedent, is different from the manner by which those contractual obligations were to be funded.

The Liquidator contends that the inter-company "entries" between Legion and Legion Indemnity, that were an integral part of the GMI Program accounting, "clearly were not inter-company receivables." Liquidator Post–Hearing Brief at 9. In fact, Mr. Frederick testified only that he did not "believe" the amount owed by Legion to Legion Indemnity was an inter-company receivable. Tr. 55. The Liquidator has produced neither authority, nor evidence, to support the contention that there is a difference between an "entry" and a "receivable." Further, the Liquidator did not present a monthly, quarterly or annual financial statement prepared pre-receivership to demonstrate Legion Indemnity had booked, as an asset, a receivable from Eagle Star, rather than Legion. Notably, a receivable from either an affiliate or a reinsurer is an admitted asset so long as it is not overdue.

Legion had a cash flow problem in 1999. Eagle Star continued to pay claims arising from the fronted business without receiving timely reimbursement from Legion. Eagle Star was "making sure that the claims that were on ... Eagle Star paper, which happened to be all reinsured to [Legion], were getting paid." Tr. 94–95.[27] By offsetting the obligation to Eagle Star from the fronted business against the quota share amounts due from Eagle Star, Legion was spared a substantial cash obligation. It could defer to another day its payment to Legion Indemnity, since both insurers were under single management.

Here, both requirements of mutuality are satisfied, and setoff is appropriate. First, there is mutuality in capacity because Legion and Legion Indemnity operated as a single entity. That relationship should continue to be recognized. Second, the obligations in question are preliquidation; thus, there is mutuality in time. In accordance with these principles, the net balance accounting used throughout the GMI Program is the appropriate means for computing Legion's debts, whether to Eagle Star or to Legion Indemnity.

Precedent supports the conclusion that post-receivership setoff is appropriate as to insolvent affiliates, with the condition that the affiliates be named in the relevant contracts. *Prudential Reinsurance Company v. Superior Court,* 3 Cal.4th 1118, 14 Cal.Rptr.2d 749, 842 P.2d 48, 60 (1992). The condition would mean, for example, that if Eagle Star had reinsured a book of medical malpractice business written by Legion Indemnity, and Legion had reinsured automobile business written by Eagle Star in Germany, setoff would not be appropriate. Here, by contrast, Legion and Legion Indemnity acted as the alter ego of the other in the GMI Program from inception. At any one time, net balance accounting may have resulted in a debt from Legion Indemnity to Legion or vice versa. They were both parties to all the contracts that made the GMI Program operational.

It is true that the facts here are not identical to those in *Prudential.* Legion and Legion Indemnity are domiciled in different states and subject to different state receiverships; in *Prudential,* the Mission affiliate insurers were all domiciled in the State of California. However, this is not a compelling factual distinction. The insolvency statutes of Illinois and Pennsylvania are not different in ways that are relevant here. Further, even if Legion Indemnity had been domiciled in Pennsyl-

---

**27.** It is important to note that it was entirely within the control of GMI and Legion Management whether to lay off the Eagle Star fronted business to Legion, Legion Indemnity or both. It is not relevant that the fronted business, by Legion's choice, was booked principally in Legion and not Legion Indemnity.

vania, it would have been subject to a receivership proceeding separate from that of Legion. Net balance accounting results in an inter-company receivable, regardless of where the affiliates are domiciled.

In *Prudential,* the California Liquidator argued that the reinsurer's right of setoff should be limited to the situation where the obligations had been debited and credited prior to liquidation. *Prudential,* 14 Cal.Rptr.2d 749, 842 P.2d at 54. The California Supreme Court rejected this narrow reading of the setoff provision in the California insurer insolvency statute.[28] Here, the Legion and Eagle Star debts and credits had been fixed prior to the appointment of a receiver. Legion did not dispute this amount, and Eagle Star, therefore, requested that the payment be remitted on or before March 29, 2002. Hearing Exhibit ES–15. Only the filing of the Legion rehabilitation petition on March 28, 2002, prevented this payment. Thus, even under the California liquidator's narrow test, setoff is appropriate in this case.

■■■ At issue are preliquidation debts. Article V fixed the rights and liabilities of Legion and its creditors as of the date the Insurance Department petitioned this Court to have Legion placed into rehabilitation. Section 520(d) of Article V provides in relevant part:

> Upon issuance of the order, *the rights and liabilities of any such insurer* and of its creditors, policyholders, shareholders, members and all other persons interested in its estate *shall become fixed*

as of the date of filing of the petition for liquidation.

40 P.S. § 221.20(d) (emphasis added). The law is nearly identical in the State of Illinois with respect to Legion Indemnity.[29] The Liquidator is without authority to restructure those rights and liabilities. As this Court has explained,

> [T]he rehabilitator or liquidator steps into the shoes of the insurer's officers and directors in the conduct of that insurer's affairs.

*Vickodil v. Insurance Department,* 126 Pa. Cmwlth. 390, 559 A.2d 1010, 1013 (1989). The intercompany settlement reflected in the March 19, 2002, cession statement was an obligation that both Legion and Legion Indemnity assumed and ratified pre-receivership by their conduct. Legion's debts resulting from the GMI Program business venture, as affirmed by the Agreement of February 21, 2002, are beyond dispute. Mr. Frederick admitted that as of March 18, 2002, Legion Indemnity expected to be paid by Legion in the amount of $12.2 million and Eagle Star expected to be paid $2.3 million. The Liquidator is constrained by Section 520(d) of Article V; Legion's debts, as they existed on the day the petition to rehabilitate Legion was filed, may not be revisited.

## Conclusion

There are two questions to be decided: whether the Liquidator's consent to the jurisdiction of the Illinois Court should be declared invalid and whether the Liquidator's August 16, 2002, revision to the

28. As noted, the California and Pennsylvania statutes are identical with respect to setoff of mutual debts and credits.

29. Section 194 of Article XIII provides in pertinent part:
    The rights and liabilities of the company and of its creditors, policyholders, stockholders or members and all other persons

interested in its assets, except persons entitled to filed contingent claims, shall be fixed as of the date of the entry of the Order directing liquidation or rehabilitation unless otherwise provided by Order of the Court.
215 Ill. Comp. Stat. 5/194(a) (2004).

March 19, 2002, cession statement was authorized. We consider these questions in reverse order.

■ The Court had two concerns about the August 16, 2002, revision. The first was whether it would reduce cash flow to the Legion estate. The record is clear that there is no possibility that losses under the GMI Program will develop in such a way that the settlement will tip in favor of Legion. The second, and central, issue is whether the August 16, 2002, revised cession statement appropriately states Legion's preliquidation obligation to Eagle Star. The Court finds that it does not. Because Legion and Legion Indemnity functioned as a single entity in the GMI Program, net balance accounting is the appropriate means for determining Legion's preliquidation obligation to Eagle Star.[30]

The fundamental fairness of setoff has long been recognized to avoid the "absurdity of making A pay B, when B owes A." *Studley v. Boylston National Bank of Boston*, 229 U.S. 523, 528, 33 S.Ct. 806, 57 L.Ed. 1313 (1913). There is nothing fair about splitting "Legion" into Legion and Legion Indemnity post-liquidation and thereby requiring Eagle Star to pay an additional $12.2 million to an entity that owes it $2.2 million.

■ On March 28, 2002, when the petition to rehabilitate Legion was filed, Legion's debt to Eagle Star had been fixed at $2,227,661 and its debt to Legion Indemnity had been fixed at $12.2 million. To

change these obligations now would violate Section 520(d) of Article V. The Liquidator lacks authority to increase the claim of one of the Legion creditors, Eagle Star, from $2.3 million to $14.5 million, while simultaneously writing down the claim of another creditor, Legion Indemnity, from $12.2 million to $0. The Court holds the August 16, 2002, cession statement to be an improper attempt to restate Legion's debts as they existed on March 18, 2002, before Legion was placed into receivership.

■ The Court returns to the question of the Liquidator's consent to allow the Illinois Court to decide Eagle Star's action for declaratory relief, the outcome of which will produce a zero sum gain for Legion. The size of Legion's debt will remain the same; the only question is the identity of the party to whom the obligation is owed. Participating in the Illinois Court proceeding does not advance the cause of marshalling assets for Legion. More troublesome is the fact that the Liquidator's consent, in effect, purported to confer jurisdiction upon the Illinois Court to determine Legion's debt to Eagle Star. This is also contrary to this Court's holding in *Commonwealth, ex rel. Sheppard v. Central Penn · National Bank*, 31 Pa. Cmwlth. 190, 375 A.2d 874 (1977).[31]

The Court holds the consent of the Liquidator to be invalid. It does not serve the interests of Legion's policyholders and creditors, and it is contrary to Article V. Only this Court has authority to determine the amount of Legion's obligations to Eagle Star.

---

**30.** This conclusion is limited to the singular facts of this case: where the practice from beginning to end was to treat Legion and Legion Indemnity as a single entity; where an agreement to settle GMI Program obligations treated Legion and Legion Indemnity as one; and where it is not disputed that pre-receivership Legion, by invoice, acknowledged a debt to Eagle Star in the amount of $2.3 million and a debt to Legion Indemnity of $12.2 million.

**31.** It is also contrary to this Court's order, in this proceeding, issued to Bank of America, N.A., denying its request to allow its counterclaim against Legion in a Florida state court proceeding.

## ORDER

And now, this 9th day of December, 2004, it is hereby ORDERED as follows:

1. The Liquidator shall withdraw the Notice of Consent filed on October 15, 2003, in *In the Matter of the Liquidation of Legion Indemnity Company*, No. 02 CH 6695, Circuit Court of Cook County, Illinois County Department, Chancery Division.

2. The August 16, 2002, cession statement is declared void. The March 19, 2002, cession statement fixed the debts of Legion Insurance Company (In Liquidation), as of March 18, 2002, to GE Frankona Reinsurance Company Ltd. and ERC Frankona Reinsurance III, Ltd. f/k/a Eagle Star Reinsurance Company, Ltd. and to Legion Insurance Indemnity Company (In Liquidation).