ALABAMA INSURANCE GUARANTY
ASSOCIATION, Objector

v.

RELIANCE INSURANCE COMPANY
IN LIQUIDATION, Respondent.

(Ancillary Matter to In Re: Reliance
Insurance Company in Liquidation,
No. 1 REL 2001).

Commonwealth Court of Pennsylvania.

Argued Feb. 12, 2014.

Decided Sept. 12, 2014.

See also, 80 So.3d 188.

Steven B. Davis and Karl S. Myers, Philadelphia, for plaintiffs.

Howard K. Glick, Birmingham, AL, for objector.

BEFORE: DAN PELLEGRINI, President Judge, and BONNIE BRIGANCE LEADBETTER, Judge, and RENÉE COHN JUBELIRER, Judge, and ROBERT SIMPSON, Judge, and MARY HANNAH LEAVITT, Judge, and PATRICIA A. McCULLOUGH, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge LEADBETTER.

We are called upon here to determine whether a claim against the Reliance estate in liquidation arises from a policy of direct insurance so as to be entitled to distribution from estate assets at priority level (b) or a policy of reinsurance entitled to priority level (e). The Liquidator assigned priority level (e) to the claim by the Alabama Insurance Guaranty Association (AIGA) for reimbursement of funds it paid to cover liability under a Reliance policy after the Alabama Supreme Court, in *Alabama Insurance Guaranty Association v. Association of General Contractors Self–Insurer's Fund,* 80 So.3d 188 (Ala.2010), ruled that the claim arose under a policy for direct insurance. We conclude that the Liquidator did not err.

AIGA paid a claim by the Association of General Contractors Self–Insurer's Fund (AGCSF) after the Alabama Supreme Court rejected AIGA's argument that the claim against AIGA was not covered[1] un-

---

1. In general, the various states, including Alabama, define a "covered claim" in a manner that excludes claims by insurers for coverage under a reinsurance policy. In Alabama, a "covered claim" is defined as:

> An unpaid claim, including one of unearned premiums, which arises out of, and is within the coverage and not excess of, the applicable limits of an insurance policy to which this chapter applies, issued by an insurer, if such insurer becomes an insolvent insurer after January 1, 1981, and (i) the claimant or insured is a resident of this state at the time of the insured event; or (ii) the property from which the claim arises is permanently located in this state. "Cov-

der the applicable guaranty association statute ("Alabama GA Act"). Thereafter, AIGA sought reimbursement by submitting its proof of claim to the Liquidator for $1,206,156.00 plus post-judgment interest on the Alabama judgment in accord with Pa.R.A.P. 3781(a). After the Liquidator issued a notice of determination (NOD) that allowed the claim at priority level (e) for benefits paid under a reinsurance policy, and disallowed the claim for post-judgment interest, AIGA filed an objection in accordance with Pa.R.A.P. 3781(c). AIGA asserted that the entire amount, including the post judgment interest, should be allowed and assigned priority level (b).[2]

This Court assigned a referee, who opined that, in Pennsylvania, the characterization of the Reliance policy as either direct insurance or reinsurance is governed by the recent decision in *CSAC Excess Insurance Authority v. Reliance Insurance Co.*, (Pa.Cmwlth., No. 1 REL 2007, filed November 8, 2012) (single judge opinion), *aff'd*, 621 Pa. 424, 78 A.3d 1058 (2013) (per curiam order) (holding that a policy nearly identical to that at issue in the present case was reinsurance). The referee rejected as waived AIGA's argument that the Full Faith and Credit doctrine required adherence to the Alabama

court's ruling that the policy was for direct insurance. He also rejected as meritless AIGA's contention that the Liquidator is estopped from challenging the Alabama court's ruling. He further opined that, if a choice of law analysis is called for, Pennsylvania prevails, as the state with the greater interest in prioritizing the claim under its liquidation statute. The referee issued a recommended decision to sustain the NOD, concluding that the Liquidator properly found the coverage under the Reliance policy to be reinsurance. AIGA then filed the instant exceptions, reasserting the contentions made in its objection to the NOD.

AGCSF is a group self-insurer pursuant to Ala.Code § 25–5–9(a), a provision of the Alabama Workers' Compensation Act that allows two or more employers to enter agreements to pool their liabilities for purposes of qualifying as self-insurers.[3] As a self-insured employer group, AGCSF and other similar groups established the Alabama Reinsurance Trust Fund (Reinsurance Trust Fund) pursuant to Ala.Code § 25–5–9(b) to pool their liabilities for purposes of each group's responsibility to provide excess coverage above the self-insured retention levels maintained by the individual employer groups.[4] In an Inden-

---

ered claim" shall not include any amount due any reinsurer, insurer, insurance pool, self-insurer, or underwriting association, as subrogation recoveries or otherwise, nor shall "covered claim" include any first party claims by a "high net worth insured."
Ala.Code § 27–42–5(6).

2. AIGA has since abandoned its claim for post-judgment interest.

3. The Alabama statute authorizes pooling of employers' liabilities for qualification as self-insurers, providing as follows:
   (a) The Director of Industrial Relations may, under such rules and regulations as he may prescribe, permit two or more employers, as such is defined in Section 25–5–1, to enter into agreements to pool their liabili-

ties under this chapter for the purpose of qualifying as self-insurers under this chapter. Each employer member of such approved group shall be authorized to operate as a self-insurer under this chapter.
   (b) Two or more employer groups as described in (a) above may enter into agreements to pool their liabilities under this chapter for the purpose of providing excess coverage above the self-insured retention levels maintained by the individual employer groups.
   . . . .
Ala.Code § 25–5–9.

4. Regulations promulgated by the Alabama Department of Industrial Relations provide that group self-insurer funds, such as AGCSF, that become members of a reinsurance trust

ture between the Reinsurance Trust Fund and the member groups, the Trust declared its purpose to be "providing excess coverage" above the respective self-insured retention of each group and promised to "issue an appropriate Policy to each" group. The Indenture further provided that: "the Trustees may, at their discretion, obtain appropriate insurance, or reinsurance, from such insurance carrier or carriers as [they] may from time to time deem appropriate." Purchase of such reinsurance is specifically permitted under applicable regulations that state: "[s]pecific and Aggregate Reinsurance is permitted for a reinsurance trust fund, but is not required." Ala. Admin. Code r.480–5–1–.04(3)(b). Electing to purchase reinsurance, the Reinsurance Trust Fund entered into a contract entitled "Certificate of Reinsurance" (Certificate) pursuant to which Reliance agreed to indemnify the Trust for losses it incurred under its promises to cover the excess liability above each group's self-insured retention.

After an injured employee's claim exceeded AGCSF's self-insured retention, AGCSF notified the Reinsurance Trust Fund, which filed a claim with Reliance[5] and, in view of Reliance's insolvency at the time, AGCSF also filed a claim with AIGA. After AIGA refused to pay the claim on the ground that it was for benefits under a reinsurance policy and thus, not a covered claim under the Alabama GA Act, AGCSF sued AIGA in the Circuit Court of Montgomery County seeking a declaration that AIGA was required to pay the claim.

The Alabama Circuit Court entered summary judgment in favor of AGCSF but failed to specify the amount of the judgment. AIGA appealed and the Supreme Court of Alabama remanded for a determination of the damages owed. On remand before the Circuit Court, the AIGA and AGCSF jointly stipulated to the amount of damages, filing a written stipulation that included a statement that is at odds with the terms of the Reliance Certificate issued to the Trust Fund. The stipulation indicates that Reliance issued a policy to the *members* of the Reinsurance Trust Fund calling for indemnity payment to *individual members*.[6] The Circuit Court

---

fund are not required to obtain excess insurance coverage in order to qualify as a self-insurer. Ala. Admin. Code r.480–5–1–.04(2).

5. In his NOD on the Trust Fund's claim, the Liquidator assigned priority level (e), as a claim under a reinsurance policy. The Trust Fund did not assert an objection.

6. The stipulation is entitled "Stipulation of Amount of Contractual Benefits Available under Reliance Insurance Policy NXC0151727 (the "Certificate of Reinsurance")." The statement of particular importance is as follows:

3. Reliance National Indemnity Company issued a Policy of Insurance (Certificate No. NXC 0151727) to the three members of the ART Fund on January 12, 1999. The certificate provides for reimbursement to the individual members of the ART Fund for "loss paid or payable as a result of: (A) Compensation and other benefit payments required of the Reassured [Insured] by the Workers Compensation Law of any state; . . .". Under Certificate NXC0151727, AGCSF has a $400,000 self-insured retention. This Certificate also has a limit of $1 Million Dollar (sic). Accordingly, the current contractual benefits and potential future contractual benefits provided for the subject work related injury are as follows:

| | |
|---|---|
| Total Benefits Paid as of 4/3/08: | $907,734.96 |
| Minus Self Insured Retention: | -$400,000 |
| Total Reimbursement Due: | $507,734.96 |
| Remainder of potential future coverage | $492,265.04 |

entered judgment for the stipulated amount. Thereafter, the Supreme Court of Alabama affirmed.

Starting with the generally accepted premise that reinsurance is coverage provided to an insurer, the Alabama Court concluded that neither AGCSF nor the Reinsurance Trust Fund is an insurer as that term is used in the Alabama GA Act or as the term is defined for purposes of Title 27 of the Alabama Code, which regulates the business of insurance generally. Thus, the Alabama Court concluded the coverage provided under the Reliance Certificate cannot be considered reinsurance. In support of its conclusion that the Certificate provided direct insurance covering AGCSF's excess liability, the Alabama Court relied in part on the joint stipulation that the Reliance Certificate provided for direct reimbursement to AGCSF as an individual member of the Reinsurance Trust Fund. The Alabama Court rejected the premise that the certificate should be considered reinsurance in view of the provision in the Ala. Admin. Code r.480–5–3–.04(3)(b) authorizing a Reinsurance Trust to purchase reinsurance. Thus, the Alabama Court rejected the premise later relied upon by our court in *CSAC.* The Alabama Court opined that: "the fact that the Reliance policy might be classified as reinsurance does not mean it is not direct insurance for purposes of the Guaranty Act." *Ala. Ins. Guar. Ass'n,* 80 So.3d 188, 209 n. 26. The Alabama Court further considered the implications of the directive in Ala. Admin. Code r.480–5–1–.04(2) that relieves a self-insurance group from the requirement to provide "other excess insurance" during the period it is a member of a reinsurance trust. The court said:

See Stipulation included in "Exhibit B: Objection to Notice of Determination" attached to AIGA's Exceptions.

It might be inferred from the use of the term "other" in the [regulation] that the Department of Industrial Relations considers a [reinsurance trust] to be providing "excess insurance" to its member groups. Because the policy issued by the Reinsurance Trust Fund has not been offered in evidence, however, it is not possible to conclude whether that policy actually is "excess insurance."

*Id.*

In the present case, AIGA contends that (1) the Liquidator is bound to follow the Alabama Court's ruling on the basis of Full Faith and Credit doctrine or collateral estoppel, (2) alternatively, if a choice of law analysis is required, Alabama prevails with the most significant contacts and interests in the policy, and (3) the Alabama Court correctly characterized the coverage as direct insurance. In response, the Liquidator first asserts that (1) neither Full Faith and Credit doctrine nor collateral estoppel apply, (2) while no conflict of law exists because the Alabama Court characterized the Certificate for purpose of GA liability as a covered claim and *CSAC* characterized a similar policy for purpose of setting a priority level on a claim, under a choice of law analysis, Pennsylvania prevails, and (3) the Certificate is for reinsurance under the ruling in *CSAC.*

■ The Alabama judgment against AIGA on a claim for guaranty association coverage has no binding effect on the Liquidator's determination as to priority of distribution from the Reliance estate.[7] With respect to Full Faith and Credit, our Supreme Court has explained:

The United States Constitution requires that full faith and credit "shall be given

7. In view of the conclusion that the Full Faith and Credit argument is meritless, we are not concerned with the assertion that the argument was waived.

in each State ... to the judicial [p]roceedings of every other State." U.S. Const. Art. IV, § 1. The Full Faith and Credit Clause thus precludes a party from attacking collaterally a *judgment* of one state by attempting to re-litigate the underlying dispute resolved by that *judgment* in another state. Thus, full faith and credit typically requires that a state give a judgment the same *res judicata* effect the *judgment* would have been afforded in the state in which it was rendered. *Thompson v. Thompson,* 484 U.S. 174, 180, 108 S.Ct. 513, 517, 98 L.Ed.2d 512 (1988); *Durfee v. Duke,* 375 U.S. 106, 109, 84 S.Ct. 242, 244, 11 L.Ed.2d 186 (1963).

*Wilkes v. Phoenix Home Life Mutual Ins. Co.,* 587 Pa. 590, 607, 902 A.2d 366, 375–6 (2006) (emphasis added). The Liquidator's argument does not present any attack on the Alabama *judgment* requiring AIGA to pay AGCSF. Rather, AIGA attempts to argue that Full Faith and Credit requires that this court is bound by all the underlying factual and legal conclusions of the Alabama Court. We disagree. Because the Full Faith and Credit Clause concerns itself with judgments, it would appear clear that our Supreme Court in *Wilkes* was referring to technical *res judicata,* or claim preclusion and not to collateral estoppel, or issue preclusion.

■ At all events, AIGA relies on both Full Faith and Credit and collateral estoppel, but neither doctrine applies here. As this court noted in *J.S. v. Bethlehem Area School District,* 794 A.2d 936 (Pa.Cmwlth. 2002):

Res judicata encompasses two related, yet distinct principles: technical res judicata and collateral estoppel. Technical res judicata provides that where a final judgment on the merits exists, a future lawsuit on the same cause of action is precluded. Collateral estoppel acts to foreclose litigation in a subsequent action where issues of law or fact were actually litigated and necessary to a previous final judgment.

Technical res judicata requires the coalescence of four factors: (1) identity of the thing sued upon or for; (2) identity of the causes of action; (3) identity of the persons or parties to the action; and (4) identity of the quality or capacity of the parties suing or being sued. Res judicata applies to claims that were actually litigated as well as those matters that should have been litigated. Generally, causes of action are identical when the subject matter and the ultimate issues are the same in both the old and new proceedings.

Similarly, collateral estoppel bars a subsequent lawsuit where (1) an issue decided in a prior action is identical to one presented in a later action, (2) the prior action resulted in a final judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action, and (4), the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action.

*Bethlehem Area School District,* 794 A.2d at 939 (citations omitted). Alabama law is not to the contrary. *See Dairyland Ins. Co. v. Jackson,* 566 So.2d 723, 726 (Ala. 1990). The Alabama decision can have no preclusive effect on the Liquidator, who was not a party or in privity [8] with a party

---

8. In both states, "privity" is similarly defined. In Alabama, privity is "deemed to arise from (1) the relationship of one who is privy in blood, estate, or law; (2) the mutual or successive relationship to the same rights of property; or (3) an identity of interest in the subject matter of litigation. Thus, the existence of privity has generally been resolved on

in that litigation, which involved a different cause of action, and thus neither Full Faith and Credit nor collateral estoppel requires that this court adopt the Alabama Court's characterization of the Reliance policy as direct insurance.

■ Furthermore, the present case does not require a choice of law determination. The law applied to decide what constitutes a covered claim under the Alabama GA Act is not in conflict with the law applicable to characterizing the policy for purpose of determining priority level for distribution from the liquidation estate. As the Alabama Court observed, the characterization of the policy may differ depending on the context in which the issue arises. *Ala. Ins. Guar. Ass'n,* 80 So.3d 188, 209 n. 26 ("the fact that the Reliance policy might be classified as reinsurance does not mean it is not direct insurance for purposes of the Guaranty Act.").

■ The policy at issue here is reinsurance pursuant to our rationale in *CSAC.* In its material characteristics, it is essentially identical to the policy we viewed as reinsurance in *CSAC.* In *CSAC,* our court summarized those characteristics, as follows:

CSAC agreed to pay claims on behalf of its members in exchange for a premium. It then contracted with Reliance for 100% indemnity of liability to its members in exchange for a ceding commission. The parties referred to the arrangement as insurance and reinsurance, the contracts function as such and a specific statutory authorization establishes that while not considered an insurer for certain purposes, CSAC could purchase reinsurance and thus function as an insurer for this purpose nonetheless.

*CSAC,* slip op. at 3.

In the present case, the Trust Fund agreed to pay the excess liability of the member groups in exchange for a premium. Section 2.01 of the Trust Indenture states:

The Trust is intended to serve as a vehicle for the pooling of liabilities of the Participating Funds [i.e. member groups] ... *so as to provide the Participating Funds with excess coverage above their respective self insured retention levels* and in furtherance of such purpose, the Trust shall (i) *serve as a repository for operation and administration* of amounts paid to the Trust by the Participating Funds in accordance with their respective Policies and the terms hereof and *of claims made by the Participating Funds pursuant to their respective Policies* and the terms hereof; ... (iii) provide for the payment of all liabilities, debts and obligations contingent or otherwise in respect of the Trust Fund; ... (vi) provide for the distribution to Participating Funds of their respective interests in all distributable property comprising the Trust Fund and

an ad hoc basis in which the circumstances determine whether a person should be bound by or entitled to the benefits of a judgment." *Stewart v. Brinley,* 902 So.2d 1, 10–11 (Ala. 2004). In Pennsylvania, "Privity is broadly defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right." *Bergdoll v. Cortes,* 858 A.2d 185, 197 n. 4 (Pa.Cmwlth.2004). AIGA and the Liquidator share no real interest; AIGA's concern was only with its liability for payment of a covered claim and the Liquidator's is solely concerned with the priority level of its payment obligation under the policy. It is not enough to establish privity that AIGA and the Liquidator for their separate reasons would both like to see the policy called reinsurance rather than direct insurance. Privity is not established by the mere fact that persons may be interested in the same question or in proving the same facts. *Bergdoll,* 858 A.2d 185, 197 n. 4.

*of any amounts payable under the Policies; . . . .*

Ex. B to AIGA's Exceptions, therein specifically Ex. E–1 to AGCSF's motion for summary judgment in the Alabama Circuit Court (emphasis added). In Section 2.04(u) of the Indenture, the Trust Fund promised to issue "an appropriate Policy to each Participating Fund." Such a "Policy" is defined in Section 1.01(c) of the Indenture as: "[a] schedule which is issued by the Trustees to a Participating Fund and which sets forth the rights with respect to excess coverage and the responsibilities (including, without limitation, premium commitments) of such Participating Fund." In Section 4.01, the Indenture further provides that each member group shall make "contributions, or premium payments, to the Trust Fund required by the Policy issued to it . . . ." While the record does not contain a policy or policies issued in accord with this provision of the Indenture,[9] it can be inferred that policies were issued; such an inference is compelled by the fact that the Trust Fund procured from Reliance the Certificate of Reinsurance that explicitly reinsured the Trust Fund's obligations under policies to its member groups.

The Reliance Certificate provides that:

In consideration of the payment of the reinsurance premium and subject to the terms and conditions contained herein, which are made part of this Certificate, Reliance National Indemnity Company

(hereinafter called the reinsurer) does hereby reinsure:

Company: *Alabama Reinsurance Trust*

. . . .

Ex. B to AIGA's Exceptions, therein specifically Ex. E–2 to AGCSF's motion for summary judgment in the Alabama Circuit Court. The Certificate sets forth a particular liability limit for each member group in accord with the member's Trust Fund policy and, specifically as to AGCSF, provides for 100% indemnification to the Trust Fund up to $1,000,000 in the event the Trust Fund incurred liability to AGCSF in excess of AGCSF's self-insured retention of $400,000.

Nothing in the Reliance Certificate directs or permits payment directly to AGCSF; rather, it states: "Nothing contained herein shall in any manner create any obligation of the Reinsurer or establish any rights against the Reinsurer in favor of the direct insured of any third parties or any persons not parties to this Certificate of Reinsurance." *See* General Condition 1 of the Certificate of Reinsurance, which appears in Ex. E–2 to AGCSF's motion for summary judgment in the Alabama Circuit Court and is included in Ex. B to AIGA's Exceptions.[10] Reliance and the Reinsurance Trust Fund are the only parties to the Certificate.[11] Neither

---

**9.** Inexplicably the policy or policies issued by the Reinsurance Trust Fund to its member groups were not included in either the record before the Alabama Court or before this court.

**10.** The dissent finds that the Certificate obligates Reliance to reimburse AGCSF based on a statement by Boyd Kelly in his affidavit and the stipulation of the parties in the Alabama litigation. D.O. at MHL–15–16. This finding is directly at odds with the language in the Certificate limiting Reliance's obligation to indemnification of the Trust.

**11.** The dissent states that: "The 'Declarations Page' of the Certificate states Reliance's agreement to *provide excess coverage to each of the three members of the Reinsurance Trust* in differing amounts . . . ." D.O. at MHL–5 (emphasis added). To the contrary, regarding coverage, the Declarations Page states:

Item V. COVERAGE: *To indemnify the Company [Alabama Reinsurance Trust]* for loss paid or payable . . . .

. . . .

Item VII. REINSURER'S LIMIT OF LIABILITY: The Reinsurer agrees *to indemnify*

the joint stipulation before the Alabama Court by AIGA and AGCSF, who were not parties under the Certificate, nor the Affidavit of the Administrator of the Reinsurance Trust Fund, Boyd Kelly, indicating that the Certificate created direct obligations to AGCSF can alter the clear and explicit language to the contrary in the Certificate.[12]

Finally, under Alabama statute, the Trust Fund, while not regulated as an insurance company, was nevertheless authorized to purchase reinsurance. A self-insured employer group and an Alabama reinsurance trust fund may obtain reinsurance pursuant to regulations of the Alabama Department of Industrial Relations. *See* Ala. Admin. Code r. 480–5–3–.08(13)(b) and r. 480–5–1–.04(3)(b). Just as we concluded in *CSAC*, the Trust Fund functioned as an excess insurer for the purpose of buying reinsurance.[13] It entered into a contract with Reliance that both parties understood to be reinsurance and the contract itself operated as reinsurance. Under these circumstances, the Liquidator appropriately treated the claim arising under the Certificate as a priority level (e) because a claim against an insolvent insurer under a policy of reinsurance is a general creditor claim.

Accordingly, we agree with the referee's recommendation to sustain the Liquidator's determination. AGCSF's objections to the NOD are overruled and the NOD is approved.

### ORDER

AND NOW, this 12th day of September, 2014, upon consideration of the Objector's Exceptions to the Report and Recommendation of the Referee, it is hereby ORDERED that the Referee's Report and Recommendation is APPROVED. Claimant's Objections are Overruled and the Notice of Determination is hereby approved.

DISSENTING OPINION BY Judge LEAVITT.

Respectfully, I dissent. The Alabama Supreme Court held that a claim of the Alabama Association of General Contractors Self–Insurer's Fund was covered by the Alabama Insurance Guaranty Association (Guaranty Association) under an insurance policy issued by Reliance Insurance Company (In Liquidation) to a group of self-insured plans. Now the Guaranty Association seeks recovery from the Reliance estate on this covered claim payment

---

*the Company* as follows: [thereafter providing differing amounts of coverage for different participating employer groups]. (emphasis added).

12. The dissent refers to the stipulation as that "of the parties." D.O. at MHL–16. The stipulation is a product of agreement between AGCSF and AIGA entered into during the Alabama litigation. While a copy of the stipulation is among the copies of filings in the Alabama action that were submitted to the referee, no similar stipulation was entered in the present litigation between the present parties. Rather, the Liquidator vigorously disputes the accuracy of the stipulation.

13. The dissent, in finding that the Certificate provides coverage similar to a "stop-loss" pol-

icy, says "the record shows that Reliance coded [the Certificate] as stop-loss." D.O. at MHL–9. A handwritten notation, stating "Code to Stop Loss," appears on a page that follows the copy of the Certificate attached as Exhibit Ex.–2 to AGCSF's motion for summary judgment in the Alabama Circuit Court. It appears in the materials provided to the referee, which included the entire record certified from the Circuit Court to the Supreme Court of Alabama. *See* "Exhibit B; Objection to Notice of Determination" attached to AIGS's Exceptions. The record before us contains no evidence regarding this particular page, i.e., who made the notation and what, if any, significance it has.

and asserts that it should be given the same priority assigned to every other state guaranty association under Section 544 of Article V of the Insurance Department Act of 1921, 40 P.S. § 221.44,[1] for their covered claim payments. Regardless of whether the Alabama judgment is binding on the issues central to this priority dispute, I believe that the Alabama Supreme Court correctly decided those issues. The Reliance "Certificate of Reinsurance," also called "Policy No. NXC015172700," was not a contract of true reinsurance between two insurance companies. Rather, it was a group excess insurance policy that covered the catastrophic workers' compensation claims of the self-insurers that were members of the group. The Reinsurance Trust Fund did not agree to pay these catastrophic claims but, rather, purchased a group insurance policy to pay them. For these reasons, I would sustain the Guaranty Association's exceptions to the Referee's decision and hold that its proof of claim

should be assigned to the priority level set forth in Section 544(b) of Article V.

## Background

Under Alabama workers' compensation law, two or more employers "engaging in the same or similar business" may group together to create a fund to cover their liabilities for the claims of their injured workers. ALA.CODE § 25–5–9(a) (West, Westlaw through 2014 Act 191);[2] *see also* ALA. ADMIN. CODE § 480–5–3–.06(n). The Alabama Association of General Contractors Self–Insurer's Fund (General Contractors Fund) is one such employer self-insurer fund. The General Contractors Fund pools the resources of its member employers and pays the obligations of those members to their injured employees in accordance with the Alabama workers' compensation law. Each of the General Contractors Fund's members satisfies the State of Alabama's statutory requirements to be a workers' compensation self-insurer by participating in the Fund.

---

1. Act of May 17, 1921, P.L. 789, added by Section 2 of the Act of December 14, 1977, P.L. 280 *as amended.* At issue in this case are priority levels (b) and (e), which are described in relevant part as follows:

   The order of distribution of claims from the insurer's estate shall be in accordance with the order in which each class of claims is herein set forth. Every claim in each class shall be paid in full or adequate funds retained for such payment before the members of the next class receive any payment. No subclasses shall be established within any class.

   * * *

   (b) *All claims under policies for losses* wherever incurred, including third party claims, and all claims against the insurer for liability for bodily injury or for injury to or destruction of tangible property which are not under policies, shall have

the next priority.

   * * *

   (e) Claims under nonassessable policies for unearned premium or other premium refunds and *claims of general creditors.* 40 P.S. § 221.44 (emphasis added). The Referee held that the claim of the Guaranty Association's payment to the General Contractors Fund was not a claim "under [a policy] for losses" but, rather, a claim of a "general creditor."

2. It provides, in pertinent part:

   The Director of Industrial Relations may, under such rules and regulations as he may prescribe, permit two or more employers ... to enter into agreements to pool their liabilities under this chapter for the purpose of qualifying as self-insurers under this chapter. Each employer member of such approved group shall be authorized to operate as a self-insurer under this chapter. ALA.CODE § 25–5–9(a) (West, Westlaw through 2014 Act 191).

According to the bylaws of the General Contractors Fund, when an employer joins the Fund, it executes a participation agreement. Pursuant to this agreement, members are assessed contributions, which are placed in a Claims Fund Account for the payment of workers' compensation claims filed by the members' individual employees. *See* Summary Judgment Motion, Exhibit C (Affidavit of Don Jones) at 1.[3] The participation agreement makes the members of the General Contractors Fund jointly and severally liable for any payments above the sum of the members' contributions. *Id.* The Fund bears the financial risk of loss for the workers' compensation claims of the employees of all employer members in the Fund. Notably, the General Contractors Fund's bylaws state that "[t]he [General Contractors] Fund is not an insurance company and does not sell insurance." Summary Judgment Motion, Exhibit C–1 (Bylaws of the General Contractors Fund) at 1.

To satisfy the Alabama law for self-insurers, the General Contractors Fund was required "to obtain specific excess insurance" to cover its large, *i.e.,* "catastrophic," workers' compensation claims. ALA. ADMIN. CODE § 480–5–3–.08(3). Alabama law also allowed the General Contractors Fund to join other like funds "to pool their liabilities ... *for the purpose of providing excess coverage* above the self-insured retention levels maintained by the individual employer groups." ALA.CODE

§ 25–5–9(b) (West, Westlaw through 2014 Act 191) (emphasis added). The Alabama Reinsurance Trust Fund was established in 1987 for this purpose, and the General Contractors Fund was a member, at least for calendar year 1999. This membership meant that the General Contractors Fund did not have "to provide other excess insurance during the period of time" in which it was a member of the Reinsurance Trust Fund. ALA. ADMIN. CODE § 480–5–1–.04(2). Notably, there is no language in the Reinsurance Trust Fund documents that makes the self-insurer members jointly and severally liable for the workers' compensation claims of the other self-insurer members of the Reinsurance Trust Fund. By contrast, such language is found in each participation agreement signed by each employer member of the General Contractors Fund. *See* Don Jones Affidavit, *supra.* The absence of such language in The Trust Indenture means that the Reinsurance Trust Fund lacked the means to pay the catastrophic claims of its members directly.

Instead, in 1999, the Reinsurance Trust Fund purchased a so-called "Certificate of Reinsurance" from Reliance to provide its member self-insurers specific excess insurance against catastrophic claims, as required by Alabama law. The "Certificate" also referred to itself as "Policy No. NXC015172700." In addition to the General Contractors Fund, the Certificate covered two other members: the Alabama

---

**3.** The documents cited herein come from Exhibit B to the Guaranty Association's exceptions to the Referee's Report and Recommendation. Exhibit B is a reproduction of the complete record before the Referee and includes the entire record certified from the Montgomery County Circuit Court to the Supreme Court of Alabama. Included in that record is the General Contractors Fund's motion for summary judgment and supporting exhibits. For ease of reference, the documents from Exhibit B will be cited in the first instance as "Summary Judgment Motion, Exhibit —— (Name of Document)." Thereafter, the cite will be to the document by name.

The Statutory Liquidator did not offer any evidence to the Referee to defend its determination on the Guaranty Association's proof of claim. Nor did it offer evidence to contradict the stipulation or exhibits submitted by the Guaranty Association to the Referee.

Don Jones is the administrator of the General Contractors Fund.

Forest Products Industry Workers' Compensation Self–Insurer's Fund and the Alabama Roofing and Sheet Metal, Heating and Air Conditioning Association Self–Insurer's Fund.[4]

The "Declarations Page" of the Certificate states Reliance's agreement to provide excess coverage to each of the three members of the Reinsurance Trust Fund in differing amounts, ranging from $750,000 to $2,000,000, and at different attachment points, ranging from $300,000 to $750,000. With respect to the General Contractors Fund, the declarations page provided:

> ALABAMA ASSOCIATION OF GENERAL CONTRACTORS
>
> A. WORKERS COMPENSATION— 100% OF $1,000,000 EACH ACCIDENT AND EACH EMPLOYESS [SIC] AS RESPECTS OCCUPATIONAL DISEASE EXCESS OF A $400,000 [SELF–INSURED RETENTION] EACH ACCIDENT AND EACH EMPLOYESS [SIC] AS RESPECTS OCCUPATIONAL DISEASE.
>
> B. EMPLOYERS LIABILITY—100% OF $1,000,000 EACH ACCIDENT AND EACH EMPLOYESS [SIC] AS RESPECTS OCCUPATIONAL DISEASE EXCESS OF A $400,000 [SELF–INSURED RETENTION] EACH ACCIDENT AND EACH EMPLOYESS [SIC] AS RESPECTS OCCUPATIONAL DISEASE.

Summary Judgment Motion, Exhibit E–2 (Reliance Certificate) at 3. The Certificate had a 12–month term, *i.e.*, from January 1, 1999, to January 1, 2000, and the annual premium was $2,055,729, to be payable in quarterly installments.

In October 2001, when the Pennsylvania Insurance Department placed Reliance into liquidation, Reliance was an admitted insurance company in Alabama. When the Reinsurance Trust Fund notified Reliance's claims department that its member, the General Contractors Fund, sought indemnification for a claim it paid in excess of $400,000, the Reliance claims department responded that the member should file a claim with the appropriate guaranty association. The General Contractors Fund did so, and the Guaranty Association paid the claim, after litigation. *Alabama Insurance Guaranty Association v. Association of General Contractors Self–Insurer's Fund*, 80 So.3d 188 (Ala.2010).

The Guaranty Association now seeks reimbursement from the Reliance estate for its payment to the General Contractors Fund, which has been determined by the Alabama Supreme Court to be a "covered claim" because it arose from an insurance policy.[5] The Alabama Supreme Court

---

**4.** .One additional member, the Nursing Home Association Self–Insurer's Fund, was named in the Reliance certificate when it was issued. On October 1, 1999, under Endorsement # 3 to "Policy No. NXC015172700," the "Alabama Nursing Home Association S.I.F." was deleted from the certificate "in consideration of a return premium of $256,834." The word "reinsurance" does not appear in Policy Endorsement # 3.

**5.** Under Alabama's insurance guaranty association law, a "covered claim" is defined as follows:

> An unpaid claim, including one of unearned premiums, which arises out of, and is within

the coverage and not in excess of, the applicable limits of an insurance policy to which this chapter applies, issued by an insurer, if such insurer becomes an insolvent insurer after January 1, 1981, and (i) the claimant or insured is a resident of this state at the time of the insured event; or (ii) the property from which the claim arises is permanently located in this state. *"Covered claim" shall not include any amount due any reinsurer,* insurer, insurance pool, self-insurer, or underwriting association, as subrogation recoveries or otherwise, nor shall "covered claim" include any first party claims by a "high net worth insured."

found, based in part on an affidavit from the Alabama Deputy Insurance Commissioner, that true reinsurance is an agreement between two commercial insurance companies engaged in the business of selling insurance. It also found that neither the General Contractors Fund nor the Reinsurance Trust Fund was, or ever functioned, as a commercial insurance company engaged in the business of selling insurance. Accordingly, it held that the Certificate was a direct policy of insurance and that the General Contractors Fund had presented a "covered claim" to the Guaranty Association. I agree with the holding of the Alabama Supreme Court, which offers a thorough and well-reasoned analysis of the record and the law. It is consistent with virtually all precedent, from a number of states, holding that an insurance company's coverage that pays the catastrophic claims of a group of self-insurers is a direct insurance policy and not a reinsurance contract.[6] It follows, therefore, that the claim of the Guaranty Association is entitled to the priority established by Section 544(b) of Article V, the same priority assigned to the "covered claim" payments made by all other state guaranty associations as a result of the Reliance insolvency.

### Priority of Reinsured's Claim Against an Insolvent Insurer Estate

Article V sets forth the order of distribution for claims against the assets of the insolvent insurer's estate. All claims in each class must be paid in full before the members in the next class receive any payment. Claims with the highest priority are those needed to administer the estate. The next highest are the claims of policyholders. The statute states as follows:

> *All claims under policies for losses* wherever incurred, including third party claims, and all claims against the insurer for liability for bodily injury or for injury to or destruction of tangible property which are not under policies, shall have the next priority.

Section 544(b) of Article V, 40 P.S. § 221.44(b). Guaranty associations step into the shoes of the insolvent insurer and pay claims under policies in accordance with the limits of the state guaranty association set by state law.[7] Accordingly, claims of guaranty associations against the insurer's estate are treated as policyholder claims. They are reimbursed at the same percentage amount as the policyholder claims that are paid directly by the insolvent insurer's estate.

By contrast, claims brought under a reinsurance contract are assigned to the class of general creditor claims. *See* Section 544(e) of Article V, 40 P.S. § 221.44(e). This is because a reinsurance contract is not considered a "policy," as the term is

---

ALA.CODE § 27–42–5(6) (West, Westlaw through 2014 Act 413) (emphasis added).

**6.** *See, e.g., Texas Department of Insurance v. American National Insurance Co.*, 410 S.W.3d 843 (Tex.2012); *Edstrom Industries, Inc. v. Companion Life Insurance Co.*, 516 F.3d 546 (7th Cir.2008), *abrogation on other grounds recognized by Affymax, Inc. v. Ortho–McNeil–Janssen Pharmaceuticals, Inc.*, 660 F.3d 281, 285 (7th Cir.2011); *Iowa Contractors Workers' Compensation Group v. Iowa Insurance Guaranty Assoc.*, 437 N.W.2d 909 (Iowa 1989). The one contrary case is *Louisiana Safety Assoc. of Timbermen Self–Insurers Fund v.*

*Louisiana Insurance Guaranty Assoc.*, 17 So.3d 350 (La.2009), which held that a group of employer-self-insurers were not entitled to guaranty fund coverage.

**7.** For example, Pennsylvania statute imposes a $300,000 limit on claims covered by the Pennsylvania Property and Casualty Insurance Guaranty Association. Section 1803(b)(1)(i)(B) of The Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, added by the Act of December 12, 1994, P.L. 1005, *as amended*, 40 P.S. § 1803(b)(1)(i)(B). A loss in excess of $300,000 is presented to the insolvent insurer's estate for payment.

used in Section 544(b). Further, a reinsurance contract covers an insurance company in the business of insurance, not a consumer of insurance. *See, e.g., Pratter v. Reliance Insurance Co.* (Pa.Cmwlth., No. 269 M.D.2001, filed September 27, 2010) at 10 (single judge opinion by Leadbetter, J.) (explaining that in a reinsurance contract "both parties are insurance companies...").

There are sound reasons for treating claims arising under insurance policies differently from claims arising under reinsurance contracts. First, insurance companies are in the business of insurance and, as a general rule, in a superior position to evaluate the insurer they choose to do business with. Second, the two insurance companies to one reinsurance contract are likely to be involved in a number of reinsurance agreements. In one treaty, Insurance Company A may be the ceding insurer and Insurance Company B the reinsurer; the roles may be reversed in the next treaty. Accordingly, when one insurance company becomes insolvent, then the other insurance company becomes both a creditor and debtor of the insolvent insurance company estate. The solvent insurance company may owe the estate monies in its capacity as reinsurer, and it may be owed monies by the estate in its capacity as reinsured. The solvent insurance company may use offset to reduce the losses caused by the inability of the insolvent insurance company to pay claims owed to the solvent insurance company under a reinsurance contract. *See generally Koken v. Legion Insurance Co.,* 865 A.2d 945 (Pa.Cmwlth.2004) (single judge opinion by Leavitt, J.). The policyholder, whose policy is cancelled within 30 days of the liquidation, is unlikely to be able to employ offset to reduce its losses.

I agree with the majority that the claim of an insurance company under a reinsurance contract, where the party acting as reinsurer becomes insolvent, should be assigned the priority of a general creditor claim, *i.e.,* 40 P.S. § 221.44(e). This principle has been adverted to in single judge opinions but not by an appellate court *per curiam,* as in the case *sub judice.*

## The Difference Between Excess Insurance and Reinsurance

As noted, reinsurance is a transaction between two insurance companies. The custom developed to call a transaction between a self-insurer and an insurance company "reinsurance," even though a self-insurer is, by definition, not an insurance company. The custom is of some vintage. As one reinsurance treatise author has observed:

> The self-insurer, for economic stability and soundness, *will obtain coverage which some may call "reinsurance" but which is really a type of "specific" excess insurance.* In some states, as in the State of New York, the self-insurer is required in workmen's compensation cases to have an insurance contract to protect him against the "catastrophic" loss.

KENNETH THOMPSON, REINSURANCE 8 (4th ed. 1966) (emphasis added). There are critical differences between excess insurance and true reinsurance.

As Thompson notes, an excess insurance policy, purchased from an insurance company, provides financial stability to a self-insured plan. The excess policy does this by assuming the self-insured plan's risk of catastrophic claims in exchange for the payment of premium. This is direct insurance between a consumer and an insurer. When the self-insured plan is created by an employer under ERISA, 29 U.S.C. § 1001, *et seq.,* to provide health and welfare benefits to employees, this coverage on catastrophic claims is called "stop-loss"

insurance. *See, e.g., American Medical Security, Inc. v. Bartlett,* 915 F.Supp. 740 (D.Md.1996).[8] When the self-insured plan is created by an employer to fund workers' compensation liabilities, this coverage on catastrophic claims is more commonly called "specific excess" insurance. *See, e.g.,* 34 Pa.Code § 125.11(b)(1). A stop-loss policy and a "specific excess" policy function identically: they indemnify the self-insured plan, or self-insurer, for payment of claims above a certain amount, *i.e.,* the attachment point.[9]

Because the excess policy reimburses the self-insured plan, also called a "self-insurer," for losses paid that exceed a contractually predetermined amount, it is direct insurance. *Texas Department of Insurance v. American National Insurance Co.,* 410 S.W.3d 843, 847 (Tex.2012). Reinsurance, on the other hand, is

> a contract whereby one insurer transfers or 'cedes' to another insurer all or part of the risk it has assumed under a separate or distinct policy or group of policies in exchange *for a portion of the premium.* In essence, reinsurance is insurance for insurance companies.

Steven Plitt, Daniel Maldonado and Joshua D. Rogers, 1A Couch on Insurance 3d § 9:1 (emphasis added). Both direct insurance and reinsurance reallocate risk; the distinction between the two turns on the nature of the purchaser. A self-insurer purchases specific excess insurance, or "direct" insurance, and an insurance company purchases reinsurance.

The distinction is also significant because "direct insurance is subject to state insurance regulation, while reinsurance is not." *American National,* 410 S.W.3d at 845. To avoid regulation, and the costs attendant thereto, American National asserted that the stop-loss coverage it provided to employer sponsored self-insured health insurance plans was reinsurance, not direct insurance.[10] The Texas Supreme Court rejected this contention. It held that self-insured employers are not " 'insurers authorized to do the business of insurance', [and thus] stop-loss coverage was not 'assumed reinsurance.' " *Id.* at 846. Accordingly, the Texas Supreme Court

---

**8.** Self-insured and self-funded plans "often purchase so-called 'stop-loss' insurance in order to limit the financial risk which the plan might face in the event of catastrophic health care expenses." *Bartlett,* 915 F.Supp. at 742. As the court in *Bartlett* further explained:

> Stop-loss insurance reimburses the employee benefit plan for claims that exceed a certain agreed-upon amount, the so-called "attachment" point. There are two types of attachment points: specific (or individual) and aggregate. *A specific attachment point represents the amount above which the stop-loss carrier must reimburse the plan for eligible claims made by an individual plan participant during the plan year.* The specific attachment point protects the plan against exceptionally high claims made by an individual participant. An aggregate attachment point represents the amount above which the stop-loss carrier must reimburse the plan for all eligible claims during the plan year....

**9.** Notably, the record shows that Reliance coded "Policy No. NXC015172700" as "stop-loss." Reliance Certificate, *supra,* at 10.

**10.** Reliance did not pay an assessment to the Guaranty Association that covered "Policy No. NXC0151700." This non-payment prompted the instant litigation.

> *Stop-loss coverage insures the employee benefit plan, not the individual participants in the plan. Thompson v. Talquin Bldg. Prods. Co.,* 928 F.2d 649, 653 (4th Cir.1991). Therefore, the purchase of stop-loss insurance does not relieve the plan of its obligation to pay benefits to plan participants, and the stop-loss insurer has no obligation to pay claims of plan participants. *Id.* ... For the purposes of ERISA, a plan remains self-funded even though covered by stop-loss insurance.

*Id.* (citations and footnotes omitted) (emphasis added).

held that American National's stop-loss policy was subject to regulation by the Texas Insurance Department, including the payment of fees and assessments to the guaranty association.

The Pennsylvania Insurance Department has adopted a statement of policy that embodies the legal analysis of *American National.* It provides, in relevant part, as follows:

(a) Section 354 of the act (40 P.S. § 477b),[11] authorizes the Department to review and approve accident and health policies filed by companies. A stop-loss policy submitted to the Department for approval shall satisfy the following conditions:

(1) *The stop-loss policy shall be issued to, and insure, the sponsor of the plan, or the plan itself, not the employes, members or participants.*

(2) Payments by the insurer shall be made to the sponsor of the plan or the plan itself, not the employes, members, participants or providers.

(3) The individual stop-loss amount; that is, retention or attachment point per claimant, shall be at least $10,000; the aggregate stop-loss amount for the plan shall be, at a minimum, $100,000 per calendar year.

\* \* \*

(b) *Stop-loss is not equivalent to reinsurance; reinsurance only relates to transactions between commercial insurers.* An entity purporting to cover self-insured plans will be treated as a stop-loss insurer and will be subject to insurance laws and regulations of the Commonwealth relating thereto and penalties for violations thereof.

31 Pa.Code § 89.472(a)-(b) (emphasis added).[12] This statement of policy rejected the position of those insurance companies that had argued that a stop-loss policy issued to a self-insured health plan was "reinsurance" and, thus, beyond regulation. It also confirmed that *"reinsurance only relates to transactions between commercial insurers."* 31 Pa.Code § 89.472(b) (emphasis added).

To be sure, the term "reinsurance" has "become confused over time by indiscriminate use." *American National,* 410 S.W.3d at 847. As has been observed:

The term "reinsurance" has been used by courts, attorneys, and writers with so little discrimination that much confusion has arisen as to what that term actually connotes. Thus, it has so often been

---

**11.** This statutory provision requires the prior approval of all insurance policies issued in Pennsylvania, not just accident and health insurance policies.

**12.** The Reliance Certificate, like any excess policy, makes the self-insurer, or plan, the insured, not the employees covered by the plan. A stop-loss policy "is issued to, and [shall] insure, the sponsor of the plan, or the plan itself, not the employes, members or participants." 31 Pa.Code § 89.472(a)(1). Likewise, Reliance insured the plans named in the Certificate, *i.e.*, the General Contractors Fund, not the individual employees covered by the self-insurer.

Paragraph 1 of the "General Conditions" attached to the Reliance Certificate states that it does not create rights in the "direct insured" or in any "persons not parties to this Certificate of Reinsurance." Reliance Certificate, *supra,* at 5. The majority asserts this is inconsistent with the Stipulation submitted in the Alabama litigation, but it is not. *See* n. 17, *infra.* First, Policy No. NXC015172700 covers self-insurers, not injured employees. Second, the Declarations Page names the General Contractors Fund. "Party" is not defined in the Certificate, and, logically, includes the member self-insurers who paid the premium.

used in connection with transferred risks, assumed risks, consolidations and mergers, *excess insurance,* and in so many other connections that it now lacks a clean-cut field of operation.

*Id.* (quoting 1 Eric Mills Holmes & Mark S. Rhodes, HOLMES' APPLEMAN ON INSURANCE § 2.15, at 317 (2d ed. 1996)) (emphasis added).

The fact that Reliance called the catastrophic claims coverage purchased by the Reinsurance Trust Fund "reinsurance" is not dispositive of whether that contract was a policy of specific excess insurance, as found by the Alabama Supreme Court, or a contract of true reinsurance, as contended by the Statutory Liquidator in this case. As noted in *Southern Sash Sales and Supply Co., Inc. v. Wiley,* 631 So.2d 968, 971 (Ala.1994), even where a policy uses the term "reinsurance," it must be interpreted according to its substance not its name.

### The Reinsurance Trust Fund Purchased a Group Policy of Excess Insurance

The majority treats the Reinsurance Trust Fund as the insurer of the General Contractors Fund's catastrophic claims. *See, e.g.,* Majority Op. at 705 ("Electing to purchase reinsurance, the Reinsurance Trust Fund entered into a contract entitled 'Certificate of Reinsurance' (Certificate) pursuant to which Reliance agreed to indemnify the Trust *for losses it incurred under its promises to cover the excess liability above each group's self-insured retention.*") (emphasis added). The Reinsurance Trust Fund made a promise "to provide" coverage, but this is not synonymous with a promise "to insure." Simply, the documents do not show that the Reinsurance Trust Fund ever promised to pay

the catastrophic claims of its member self-insurers.

First, and most critically, the Reinsurance Trust Fund instrument does not contain an insuring agreement, which is

the heart of an insurance contract. The insuring agreement summarizes the major promises of the insurer .... [*i.e.,*] the conditions under which losses are to be paid[.]

GEORGE E. REJDA, *Principles of Risk Management and Insurance* (6th ed. 1998) at 77. Nowhere in the Trust Indenture is there a statement that the Reinsurance Trust Fund itself will pay claims, in what amount, to whom or under what circumstances. The only insuring agreement in the record is that which appears in the Reliance Certificate; it states the amount of coverage and the terms for paying each member self-insurer's loss. This is because Reliance, not the Reinsurance Trust Fund, was the insurer of each member self-insurer's catastrophic claims.

Second, the Reinsurance Trust Fund promised only "to provide" excess coverage. It honored this promise by purchasing a group policy from Reliance on behalf of the group's members. A group insurance policy covers many persons under one contract and thereby achieves cost savings for the members of the group.

Employers routinely "promise to provide" their employees health insurance, and they do so by purchasing a group policy.[13] The employer is neither the insurer nor the insured, but the holder of the master contract. It performs administrative functions by collecting premiums from employees and distributing claim forms, which otherwise would be done by the insurer. By pooling the potential losses of a large group and performing services that would otherwise be done by the

---

13. Sometimes employers use a trust fund to hold and manage the group insurance plan.

insurer, the employer achieves a reduction in cost. As Rejda explains:

> A distinctive characteristic of group insurance is the coverage of many persons under one contract. A master contract is formed between the insurer and group policyowner for the benefit of the individual members. In most plans, the group policyowner is the employer. *Employees receive a certificate of insurance that shows they are insured.*
>
> A second characteristic is that group insurance may be relatively lower in cost than comparable insurance purchased individually.

REJDA at 411 (emphasis added).[14] Likewise, here, the Reinsurance Trust Fund functioned as the master contract holder for its members.

Group insurance is not limited to health insurance. In 1980, Congress enacted the Liability Risk Retention Act to allow businesses to group together to provide insurance coverage for each member's third-party liabilities, with the exception of workers' compensation liabilities. 15 U.S.C. § 3901(a)(2)(A). Under the federal Liability Risk Retention Act, members of the group must be "engaged in businesses or activities similar or related with respect to the liability to which such members are exposed...." *Id.* at § 3901(a)(4)(F), § 3901(a)(5)(C). The group's "insurance" may include "primary insurance, excess insurance, reinsurance, surplus lines insurance, and any other arrangement for shifting and distributing risk...." *Id.* at § 3901(a)(1). The group may be a "risk retention group" or a "risk purchasing group." The former acts as the insurer and pays claims; a risk retention group

must be a licensed insurance company in at least one state. 15 U.S.C. § 3902(c). By contrast, a "purchasing group" "purchases [liability] insurance only for its group members." 15 U.S.C. § 3901(a)(5)(B).

The Alabama workers' compensation statute authorizes the establishment of a "reinsurance trust fund" to provide its members with the mandatory excess insurance. The Alabama statute is not specific on how the reinsurance trust fund will do this. The Reinsurance Trust Fund's Indenture states that

> [t]he Trustees may, at their discretion, obtain appropriate insurance, or reinsurance, from such insurance carrier or carriers as the Trustees may from time to time deem appropriate.

Summary Judgment Motion, Exhibit E–1 (Reinsurance Trust Indenture) at Section 2.04(v). The Alabama Supreme Court concluded that

> the Reinsurance Trust Fund is nothing more than a group of self-insured employer groups that have pooled their workers' compensation liability risks for purposes of "excess coverage" of the various member groups' workers' compensation claims.

*Alabama Insurance Guaranty Association,* 80 So.3d at 208 n. 25. Accordingly, the Alabama Supreme Court concluded that the Reinsurance Trust Fund was not an insurer, but a group that purchased a policy of specific excess insurance. *Id.* at 208. This conclusion is consistent with the record.

The administrator of the Trust, Boyd Kelly, explained that the role of the Rein-

---

**14.** Section 354.5 of the Insurance Department Act of 1921, added by the Act of February 17, 1994, P.L. 92, states:

> *Any certificate issued* on or after the effective date of this section *under a group policy* issued prior to the effective date of this section ... shall comply with the provisions of this act.

40 P.S. § 477b.5 (emphasis added).

surance Trust Fund was to secure excess coverage for its members:

> In 1998, the [Trust] Fund, acting as a broker for its members, sought to secure an insurance policy for its members with Reliance National Indemnity Company for the purpose of providing "excess coverage above the self insured retention levels maintained by each member" .... Each of the member funds reimbursed the [Trust] Fund for premium paid that was attributable to each fund based on that fund's limits of coverage and its retention amount.... The Reliance policy agreed to reimburse each [Trust] Fund members [sic] when its losses had exceeded an amount called the retention level up to a specific amount which varied according to the member self-insured fund.

Summary Judgment Motion, Exhibit E (Affidavit of Boyd Kelly) (emphasis added). Kelly's affidavit is consistent with Section 2.01 of the Trust Indenture, which stated that the

> Trust is intended to serve as a vehicle for the pooling of the liabilities of the Participating Funds ... so as to provide the Participating Funds with excess coverage above their respective self insured retention levels....

The Certificate satisfied the Alabama regulation, which required each of the three Trust members to secure excess insurance on its catastrophic claims. ALA. ADMIN. CODE § 480–5–3.08.[15]

Finally, a stipulation between the General Contractors Fund and the Guaranty Association also supports the conclusion that the Reinsurance Trust Fund functioned as the group policyholder. The relevant stipulation provides as follows:

> 3. Reliance National Indemnity Company issued a Policy of Insurance (Certificate No. NXC 0151727) to the three members of the [Trust] Fund on January 12, 1999. This certificate provides for reimbursement to the individual members of the [Trust] Fund for "loss paid or payable as a result of: (A) Compensation and other benefit payments required of the Reassured [Insured] by the Workers Compensation Law of any state...."

Stipulation of Amount of Contractual Benefits Available Under Reliance Insurance Policy NXC015727, April 7, 2008, at 2 (quoting Reliance Certificate, supra, at 2) (emphasis added).[16] The "Reassured" in this case was the General Contractors Fund.

The Statutory Liquidator presented no evidence to the Referee. It did not challenge the factual verity of any statement in the stipulation, including the statement that the Certificate obligated Reliance to reimburse the self-insurer members, not the Reinsurance Trust Fund itself. Moreover, the reference to "Reassured" in the Certificate can mean only the member self-insurers, one of which is the General Contractors Fund. It is the self-insurer that bears the obligation to make "benefit payments" in accordance with the Alabama Workers' Compensation Law. Reliance Certificate, supra, at 2. In addition, the Certificate states, explicitly, that the Reinsurance Trust Fund has "0%" liability for these benefit payments.

---

15. *Cf.* 34 PA.CODE § 125.11(c) (requiring a Pennsylvania self-insurer to file a "certification that [its] policy fully complies" with the excess coverage requirement).

16. The Stipulation may be found in Exhibit B to the Guaranty Association's Exceptions, as an attachment to the Guaranty Association's Motion to Supplement the Record on Appeal to the Supreme Court of Alabama filed April 21, 2008.

In sum, the Reinsurance Trust Fund promised to provide its members excess insurance coverage of their catastrophic claims, which it did by purchasing a group policy from Reliance. There is no documentary evidence that the Reinsurance Trust Fund, itself, incurred any obligation to pay these claims. It was the Statutory Liquidator's obligation to prove that the Reinsurance Trust Fund acted as the insurer of these claims, and it did not so prove. Indeed, it presented no evidence to the Referee. It was solely Reliance that incurred the obligation to reimburse the member self-insurers for their payment of catastrophic claims in accordance with the terms and conditions spelled out in the "Declarations Page" of "Policy No. NXC015172700."

## The Alabama Supreme Court

The Alabama Supreme Court thoroughly reviewed the documents, noting the ambiguities in the documentation as well as in the statute and in the Alabama Department of Industrial Relations' regulations on self-insurer funds. This ambiguity rested in the interchangeable use of the words "excess insurance" and "reinsurance." After a close read of the parties' stipulation, the Trust Indenture and the Certificate, the Alabama Supreme Court concluded that Reliance issued a policy of excess insurance, not a reinsurance treaty. I agree with its analysis and conclusion.

The majority notes that the Trust Indenture has a provision that the Trust Fund would "issue an appropriate Policy" to each member self-insurer. "Policy" is defined in the Trust Indenture as follows:

A schedule which is issued by the Trustees to a Participating Fund and which sets forth the rights with respect to excess coverage and the responsibilities (including, without limitation, premium commitments) of such Participating Fund.

Reinsurance Trust Indenture, *supra,* at Section 1.01(c). A copy of the "Policy," if one was issued to the General Contractors Fund, was not included in the record. "A schedule" is not a promise to pay claims of a certain type and in a certain amount.

The Alabama Supreme Court concluded that the Trust Indenture was "in the nature of a nonrecourse obligation so far as [the Reinsurance Trust Fund] was concerned." *Alabama Insurance Guaranty Association,* 80 So.3d at 198 n. 13. This is because the Certificate stated that the Reinsurance Trust Fund would "retain for its own account" "0%" of workers' compensation liability and "0%" of employer's liability. *Id.* at 193.[17] By contrast, the member self-insurer had full liability for all workers' compensation claims; Reliance had the liability to reimburse the self-insurer for its catastrophic claims payments in accordance with the terms set forth in the Certificate.

Also significant to the Alabama Supreme Court was the parties' stipulation that the General Contractors Fund, not the Reinsurance Trust Fund, made the payment of $907,734.96 that triggered the dispute with the Guaranty Association.

17. The majority believes that the Certificate provided coverage to the Reinsurance Trust Fund because the Declarations Page states that Reliance "will indemnify the Company for loss paid or payable." Majority op. at 709 n. 11. However, the Certificate also states that the Company retained "0%" liability. Reliance Certificate, *supra,* at 2. If the "Company" has no liability, it is impossible for Reliance to indemnify that "Company." The insuring agreement in the Reliance Certificate names each "reassured," as well as their amounts and terms of coverage. Without this insuring agreement, promising to reimburse the self-insurers for certain of their claims payments, the Certificate would provide illusory coverage.

*Id.* at 199. Further, the parties stipulated that Reliance, not the Reinsurance Trust Fund, was required to reimburse the General Contractors Fund $507,734.96. *Id.* This stipulation cannot be reconciled with a reinsurance-type agreement. Even where an insurer acts as a fronting company for a reinsurer that has assumed 100% of the insurance company's underwriting risk, the fronting company makes the claim payment and then seeks reimbursement from the reinsurer. *See* Steven Plitt, Daniel Maldonado and Joshua D. Rogers, 1A COUCH ON INSURANCE 3d § 9:2. That did not happen here.

Other language in the Certificate supports the conclusion that the contract provided direct insurance to member self-insurers, not reinsurance to the Reinsurance Trust Fund. For example, the first page of the Certificate is entitled "Declarations Page." As treatise authority explains, "[t]he declarations section is the first part of an insurance contract ... [and] usually can be found on the first page of the policy or on a policy insert." REJDA at 77. The declarations page identifies the property or activity insured; the period of protection; amount of insurance and premium; and other relevant information. *Id.* To cite another example, the Certificate also calls itself "Policy No. NXC015172700." [18] In fact, this reference appears more often than the word "reinsurance." Further, attached to the Certificate were "endorsements" that consistently refer to the Certificate as "Policy No. NXC015172700" and do not use the word "reinsurance," even once. Endorsements "modify, extend, or delete provisions found in the original policy." REJDA at 80. By contrast, an amendment to a reinsurance treaty or contract is called an "addendum" not a policy endorsement. *See, e.g.,* THOMPSON at 429. All these examples show the Certificate to be a contract of direct insurance and not a contract of reinsurance between two commercial insurers.

The Alabama Supreme Court also relied upon a report of the National Association of Insurance Commissioners (NAIC) that concluded that a group of employers that were self-insured for workers' compensation would be eligible for guaranty fund protection on that part of their program that was insured, *i.e.,* the large claims. On this point, the Alabama Supreme Court quoted from a Connecticut Supreme Court decision:

> While such groups are not identical to an individual [self-insured] employer ..., they do self-insure, as a group.... The report states in two different places that if a self-insured workers' compensation group's excess insurance carrier becomes insolvent, the group should be able to turn to the state's insurance guaranty association fund for protection.

*Alabama Insurance Guaranty Association,* 80 So.3d at 205 (quoting *Doucette v. Pomes,* 247 Conn. 442, 724 A.2d 481, 491–92 (1999)). Stated otherwise, the General Contractors Fund ceased to be a self-insurer but, rather, became an insured with respect to losses that exceeded the attachment point, *i.e.,* $400,000.

The Alabama Supreme Court concluded that the words "reinsurance" and "excess insurance," as used by the Alabama Director of Industrial Relations, were not dispositive of the meaning of Alabama's

---

18. As noted in the July 2, 2004, letter of counsel for the General Contractors Fund to counsel for the Guaranty Association, the Reliance "policy form designation (NXC)" is not consistent with a reinsurance agreement or treaty. Summary Judgment Motion, Exhibit I

(Letter from Susan G. Copeland, Esq. to Howard K. Glick, Esq. (July 2, 2004)) at 4. Policies are assigned individual numbers each year for tracking purposes. *See, e.g., McDonnell v. Insurance Dept.,* 94 Pa.Cmwlth. 381, 503 A.2d 1042, 1043 (1986).

insurance laws, including the guaranty fund statute. It found persuasive the Alabama Insurance Commissioner's statement that neither the Reinsurance Trust Fund nor its members were commercial insurers and that true reinsurance is a contract between two commercial insurers. Pennsylvania law is consistent with this conclusion. The Insurance Department has publicly announced that a self-insurer's excess coverage "is not equivalent to reinsurance; reinsurance only relates to transactions between commercial insurers." 31 PA. CODE § 89.472(b). Not even the Statutory Liquidator contends that the Reinsurance Trust Fund is a commercial insurance company.

Noting that "self-insurance is the antithesis of insurance," *Alabama Insurance Guaranty Association*, 80 So.3d at 206, the Alabama Supreme Court concluded that the sole purpose of the General Contractors Fund and the Reinsurance Trust Fund was to facilitate self-insurance by a select group of employers who qualified for membership. The Reinsurance Trust Fund's role was to enter the insurance marketplace as a consumer to purchase excess coverage for its members. Thus, the Alabama Supreme Court held that Reliance issued a policy of direct insurance to the group. I agree with that conclusion in every respect.

### A Group of Self–Insurers Becomes Insured to the Extent It Contracts With an Insurance Company

The Alabama Supreme Court relied upon *Iowa Contractors Workers' Compensation Group v. Iowa Insurance Guaranty Association*, 437 N.W.2d 909 (Iowa 1989), as instructive on the roles of the parties and their relationship to one another. In *Iowa Contractors*, the Master Builders of Iowa and the Associated General Contractors formed the Iowa Contractors Workers Compensation Group (Group) to self-insure the workers' compensation claims of their members. The members' assessments, which were based upon their prior losses, were placed into a fund for payment of workers' compensation benefits to injured employees. Members were also jointly and severally liable for any payments the assessment fund could not cover. The Group purchased an annual excess workers' compensation policy from Mission Insurance Company, which covered all claims exceeding 80 percent of the Group's annual gross assessments.[19] When Mission was declared insolvent, the Group presented its claims for 1985 that exceeded its deductible to the Iowa Insurance Guaranty Association. The guaranty association refused to pay, asserting that the Mission policy was reinsurance and, therefore, the Group's claims were not covered claims.

The Iowa Supreme Court rejected the guaranty association's argument, holding that the Mission policy was direct insurance, which it defined as "an insurance contract between the insured and the insurer which has accepted the risk of a designated loss to such insured, which relationship is direct and uninterrupted by the presence of another insurer." *Id.* at 913 (quoting *Zinke–Smith, Inc. v. Florida Insurance Guaranty Association, Inc.*, 304 So.2d 507, 508 (Fla.Dist.Ct.App.1974)). Applying this definition, the Iowa Supreme Court rejected the guaranty association's argument that the relationship between Mission and the members of the Group was not direct because it was interrupted by another insurer, *i.e.*, the Group. The Iowa Supreme Court explained:

> [T]he Association's argument focuses on the wrong relationship. The relevant

19. A second insurance company, White Oak, reinsured Mission for all claims exceeding 80 percent, up to 100 percent. White Oak was not a party to the appeal.

relationship, we think, is between Mission and the Group. *The only insurance contract at issue here is between Mission, as the insurer, and the Group, as its insured.* The Mission policy was not interrupted by the presence of another insurer. We see no significant difference between a single self-insured employer and a group of self-insured employers. In both instances, the insurer's relationship is with the employer or the group of employers, and not with the individual employees.

*Iowa Contractors*, 437 N.W.2d at 914 (emphasis added). As for the guaranty association's claim that the Group was an insurer, the Iowa Supreme Court accepted the Group's argument that "it did not assume the risks of its members—it merely acted as an agent for all its members to spread their risks of adverse workers' compensation claims among themselves through the joint and several liability provision in the indemnity agreement." *Id.* at 917.

This case provides strong precedent. Other courts across the country have reached similar results where guaranty associations have sought to deny the claims of self-insurers that had purchased policies of excess insurance. *See, e.g., Zinke–Smith*, 304 So.2d 507; *Stamp v. Department of Labor and Industries*, 122 Wash.2d 536, 859 P.2d 597 (1993); *Levi Strauss & Company v. New Mexico Property & Casualty Insurance Guaranty Association*, 112 N.M. 433, 816 P.2d 502 (1991). The Alabama Supreme Court's holding that the Reinsurance Trust Fund was a group policyholder, not an insurer, is consistent with virtually all state precedent.[20]

### Conclusion

The Alabama Supreme Court affirmed the declaratory judgment of the Circuit Court of Montgomery County, Alabama, that the

> [Alabama General Contractors Fund's] claim is a "covered claim" under the Alabama Insurance Guaranty Act and [Alabama General Contractors Fund] is entitled to be paid for its claim under the Act[.]

*Association of General Contractors, Self Insurers v. Alabama Insurance Guaranty Association* (Circuit Court of Montgomery County, Case No. CV–2005–450, filed November 16, 2006). The Guaranty Association contends that the Alabama Supreme Court's judgment is entitled to full faith and credit.[21] Even if not required, as a matter of policy, the Statutory Liquidator should give deference to a final court judg-

---

**20.** The Alabama Supreme Court's judgment identified several persuasive reasons why neither the Reinsurance Trust Fund nor the General Contractors Fund was an "insurer," which Alabama's Guaranty Act defines as "[e]very person engaged as indemnitor, surety or contractor *in the business of entering into contracts of insurance.*" ALA.CODE § 27–1–2 (West, Westlaw through 2014 Act 191) (emphasis added). The Alabama Supreme Court noted that not all persons who contract to provide coverage are "in the business of entering into contracts of insurance." *Alabama Insurance Guaranty Association*, 80 So.3d at 203. The Court found it reasonable to conclude that a group formed for the purpose of allowing its members to qualify as self-insur-

ers under the workers' compensation law and that is subject to regulation by the Department of Industrial Relations (not the Department of Insurance) is not "in the business of entering into contracts of insurance." *Id.* at 204.

**21.** Instead, the Statutory Liquidator repeated the work of the Alabama Supreme Court and came to a different conclusion, *i.e.*, that the Certificate was a reinsurance contract, not an excess insurance policy. In other words, the Statutory Liquidator concluded that the claim of the General Contractors Fund was not a covered claim of the Guaranty Association under Alabama law.

ment holding that the claim of the General Contractors Fund was "covered" by the Guaranty Association. Guaranty associations, as do insurers, can and do litigate claims that they do not believe to be covered by an insurance policy or, in this case, statute. The dispute may arise from a disagreement about the scope of coverage provided in the insurance policy or from a disagreement about whether the insured was liable in negligence to the third party claimant. Guaranty associations, as do insurers, settle such disputed claims. Guaranty association claim payments are entitled to the same priority as a policyholder's claim against the estate of an insolvent insurance company. *General Reinsurance Corp. v. American Bankers Insurance Company of Florida,* 996 A.2d 26, 34 (Pa.Cmwlth.2009). This appears to be the first time a statutory liquidator, in any state, has decided to review, let alone reject, a guaranty fund's payment of a "covered claim" made in accordance with its own state law. This sets a worrisome precedent because it creates unnecessary uncertainty in the insurance insolvency system that requires cooperation among the several states.[22]

Guaranty associations pay claims by raising funds through assessments on insurers doing business in their respective state. In turn, insurers pass along the cost of guaranty association assessments to their policyholders as part of the premium cost. To the extent guaranty associations can be reimbursed by the estate of the insolvent insurer, insurers, and ultimately their policyholders, obtain relief. Alabama policyholders, unlike policyholders in other states, will be denied this premium relief.

I believe the record supports the conclusion of the Alabama Supreme Court. The claim of the Alabama Association of General Contractors Self–Insurer's Fund arose from Policy No. NXC015172700, a group excess policy issued by Reliance to insure the catastrophic claims of the members of the Reinsurance Trust Fund, including the General Contractors Fund. The Alabama Insurance Guaranty Association's payment of that "covered claim" should be assigned the priority of a Section 544(b) claim, the same priority assigned to the covered claims paid by every other state guaranty association. Accordingly, I would sustain the exceptions of the Alabama Insurance Guaranty Association.

Judge COHN JUBELIRER and Judge SIMPSON join in this dissent.

---

22. Further, the Statutory Liquidator's determination on the Guaranty Association's proof of claim produces anomalous results. The Guaranty Association's expenses in litigating the claim of the General Contractors Fund will be reimbursed by the Reliance estate as an administrative expense of the estate. *See* Section 544(a) of Article V of the Insurance Department Act of 1921, 40 P.S. § 221.44(a) (assigning highest priority level to "costs and expenses of administration," including "the expenses of a guaranty association in handling claims."). It is awkward, at the least, that the claim itself will not be assigned the priority of a covered claim. Because the Guaranty Association is barred by statute from paying a claim under a reinsurance contract, the Statutory Liquidator's assignment of its claim as that of a general creditor is erroneous. An illegal or voluntary payment made on behalf of Reliance is not a valid claim against the estate.